```
Blake A. Field
9805 Double Rock Dr.
Las Vegas, NV 89134
(702) 373.1022
Pro Se Plaintiff
```



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| BLAKE A. FIELD, | Case No. CV-S-04-0413-RCJ-GWF |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANT / COUNTER-CLAIMANT GOOGLE, INC.'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| GOOGLE, INC., a corporation | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |
| AND RELATED COUNTERCLAIMS | |

COMES NOW Plaintiff, Blake A. Field, who hereby submits his Opposition to Defendant/Counterclaimant Google, Inc.'s Motion for Summary Judgment.

## I. INTRODUCTION

On September 27, 2005, Defendant/Counterclaimant Google, Inc. ("Google") filed its Motion for Summary Judgment. Therein, it alleges that Google cannot be liable for direct infrinement, and that in any regard doctrines of implied license, estoppel, and fair use preclude liability for what would otherwise be infringing use of Plaintiff's works. As shown below, the motion is left unsupported by fact and law, and hence should be rejected.

## II. ARGUMENT

**A.  Google has reproduced and distributed Plaintiff's copyrighted works and as such is liable for direct infringement.**

Google posits that it cannot be liable for direct infringement because its servers respond automatically to users' requests for cached pages, and that this somehow makes Google a passive player in the process of copying and distributing pages from its cache upon request from its customers. See Motion at pp. 19-20. Per Google, "[w]ithout the user's request (for a webpage),

48

nothing would happen. Accordingly, it is the user who creates the copy in question, not Google." Id. at pp. 19, lines 8-10. To support this argument, Google cites to wholly inapplicable law. First, Google cites to UMG Recordings, Inc. v. Hummer Winblad Venture Ptnrs. (In re Napster, Inc.), 377 F. Supp. 2d 796 (D. Cal. 2005). Those portions of this opinion cited by Google relate to a claim by the plaintiffs that the Napster music file sharing service, merely by maintaining an index of available files to download, directly infringed the plaintiffs' copyrights without more. Id. at 803. The Court rejected this theory of liability, stating:

> Napster did not have works in its "collection"; it did not have a "collection" of recordings. The infringing works never resided on the Napster system. Instead, plaintiffs here seek to establish copyright infringement based on the mere fact that the names of their copyrighted musical compositions and sound recordings appeared in Napster's index of available files. This might constitute evidence that the listed works were available to Napster users, but it is certainly not conclusive proof that the songs identified in the index were actually uploaded onto the network..
>
> Rather than requiring proof of the actual dissemination of a copyrighted work or an offer to distribute that work for the purpose of its further distribution or public performance, plaintiffs' theory is premised on the assumption that any offer to distribute a copyrighted work violates section 106(3). This is not sufficient to satisfy plaintiffs' burden of proving that Napster or its users directly infringed their copyrighted musical compositions and sound recordings, as they must do if they are to hold defendants secondarily liable for that infringement.

Id. at 803, 805. Thus, the court in In re: Napster, Inc. merely rejected the plaintiffs' argument that by simply maintaining an index of potentially infringing files, Napster infringed plaintiffs' copyrights.

Here, the functionality of the Google cache is very different from that in Napster. First, Google's webcrawling robot, the Googlebot, copies each and every webpage it visits back to Google servers. See Decl. Brougher at ¶ 4-5. Unless a webpage contains a meta-tag instructing to the contrary, the copy of that webpage remains on Google's servers as the Google cache of that webpage. See Decl. Brougher at ¶ 19. A link to the Google cache copy of the webpage is included in pertinent Google search results and may be accessed directly. See Decl. Brougher at ¶ 7. When an internet user clicks that link or directs his or her browser to the URL of that link, Google reproduces its cache copy of that webpage and distributes it to the requesting user. See Decl. Brougher at ¶ 8.

Hence, here it is Google itself that gathered the copyrighted materials, Google itself which stores the material on its own servers, and Google itself which reproduces and distributes those materials at the request of its customers. That Google responds automatically to a request of its customer to do so is of no import. By reproducing and distributing the materials at the request of its customers, Google itself directly infringes Plaintiff's copyrights. See Playboy Enters. v. Webbworld Inc., 991 F. Supp. 543 (D. Tex. 1997)

Google's cited case of Sega Enters. v. MAPHIA, 948 F. Supp. 923 (D. Cal. 1996) does not support its notion that it cannot be held directly liable for copyright infringement. In Sega, defendant operated a file-sharing service to which users could dial-in and connect by modem. Once connected, users could upload Sega videogames onto defendant's service, and download therefrom as well. Id. at 927. After finding that uploading and downloading illustrated copying by *someone*, the Sega court stated:

> This does not end the inquiry, however, because it does not establish whether Sherman, as the BBS operator, is directly liable for the copying. In Netcom, the court found that the Internet provider was not directly liable for copyright infringement of a copyrighted work posted and distributed through its system. Netcom, 907 F. Supp. at 1368-70. The Netcom court held that "although copyright is a strict liability statute, there should be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party." Id. at 1370. "Where the infringing subscriber is clearly directly liable for the same act, it does not make sense to adopt a rule that could lead to the liability of countless parties whose role in the infringement is nothing more that setting up and operating a system that is necessary for functioning of the Internet," even where the Internet provider has knowledge of potential copyright infringement by its subscribers. Id. at 1372-73.
>
> While Sherman's actions in this case are more participatory than those of the defendants in Netcom, the Court finds Netcom persuasive. Sega has not shown that Sherman himself uploaded or downloaded the files, or directly caused such uploading or downloading to occur. The most Sega has shown is that Sherman operated his BBS, that he knew infringing activity was occurring, and that he solicited others to upload games. However, whether Sherman knew his BBS users were infringing on Sega's copyright, or encouraged them to do so, has no bearing on whether Sherman directly caused the copying to occur. Id. at 1372. Furthermore, Sherman's actions as a BBS operator and copier seller are more appropriately analyzed under contributory or vicarious liability theories. Therefore, because Sega has not shown that Sherman directly caused the copying, Sherman cannot be liable for direct infringement.

Sega Enters. v. MAPHIA, 948 F. Supp. 923, 932 (D. Cal. 1996) (quoting in part Religious Technology Center v. Netcom On-line Communication Services, Inc., 907 F. Supp. 1361 (N.D.

Cal. 1995)). Hence, because defendant in Sega did not directly cause the copying to occur, there was no liability for direct copyright infringement.

Those factors mentioned by the Sega court as establishing direct infringement are present here. Again, it is Google which copies material to its own servers – in other words, Google uploads this material to its own servers. See Decl. Brougher at ¶ 4-5. It is Google itself which makes its cache copies of webpages available. And it is Google itself which responds to its customer's requests by reproducing and distributing to those requesting users webpages from its cache. No more compelling case could be made for direct copyright infringement. Thus, Google's erroneous notion that it is not directly liable for copyright infringement should be rejected.

**B.     Google's equitable estoppel defense / counterclaim is without merit.**

Google's webcrawling robot, the Googlebot, copies each and every webpage it visits back to Google servers. See Decl. Brougher at ¶ 4-5. Unless a webpage contains a meta-tag instructing to the contrary, the copy of that webpage remains on Google's servers as the Google cache of that webpage. See Decl. Brougher at ¶ 19. A link to the Google cache copy of the webpage is included in pertinent Google search results. See Decl. Brougher at ¶ 7. When an internet user clicks that link or directs his or her browser to the URL of that link, Google reproduces its cache copy of that webpage and distributes it to the requesting user. See Decl. Brougher at ¶ 8. Google has attempted to place the world on constructive notice that all webpages will be cached, reproduced, and distributed at will by Google UNLESS instructed otherwise by including specific code on each webpage which tells Google to not take such action. See Decl. Brougher at ¶ 18. It has attempted to do so by briefly outlining the process on a webpage at google.com. See Decl. Brougher at ¶ 20-22. Hence, unless one opts-out, one's webpages will be included in the cache and subject to reproduction and distribution therefrom.

Google now argues that anyone with this knowledge of how to PREVENT Google from caching, reproducing and distributing webpages is under a duty to speak to effectuate that end. See Motion at pp. 2, lines 21-28, pp. 3 lines 1-12. Per Google, those who do not speak up have

granted an implied license, and/or are equitably estopped from asserting a copyright claim relative to such reproduction and distribution:

> Given this...use of works by search engines, if copyright holders remain silent by not utilizing industry-standard instructions to limit use of their content, they impliedly license such use as a matter of law.

See Motion at pp. 22, lines 10-12. This legally unfounded notion, of course, puts the cart before the horse. Google is under an affirmative duty to inquire and obtain permission to use copyrighted works, rather than have those whose works it will use take action to PREVENT such use. The law requires this, and it may not be trumped by convenient industry standards.

Google claims that the opt-out arrangement it has conveniently established for itself is necessary because it could not possibly contact every webmaster to request express permission to cache his or her webpages. See Motion at pp. 22, lines 18-22. It is ironic, then, that Google admits that it can contact each and every webmaster via automated means to determine whether Google has been denied permission to cache a given webpage. See Motion at pp. 22, lines 7-10, Decl. Brougher at ¶ 22. It begs the question: if Google can set up its cache as an opt-out function, why could it not be set up as an opt-in function? Rather than require affirmative action to PREVENT caching (and reproduction and distribution) of copyrighted works, why not put the world on constructive notice of how to INCLUDE pages in the cache should webmasters so desire? The answer to this question is, of course: because it is not convenient for Google's uses.

As discussed below, Google's attempt to impose a duty to speak on Plaintiff to PREVENT Google's use of Plaintiff's works is not countenanced at law. Indeed, at no point does Google even argue that Plaintiff had a duty to speak – rather, Google meekly posits that Plaintiff's silence alone entitles it to an implied license to use Plaintiff's works, or estops Plaintiff from asserting his copyrights. For these reasons, and those elucidated further below, Google's defenses / counterclaims for implied license and equitable estoppel are meritless as a matter of law.

    **1.    Plaintiff owed no duty to speak to Google. Therefore, Google's equitable estoppel defense, which relies on Plaintiff's silence, fails as a matter of law.**

Google's affirmative defense of estoppel is predicated on Plaintiff's silence. Per Google, Plaintiff's failure to speak up and inform Google that Plaintiff did not want his webpages reproduced and distributed by Google misled Google into including those webpages in its cache, and reproducing and distributing those webpages therefrom. See Motion at pp. 26, lines 20-26; pp. 27 lines 11-2. The law is well settled that, when an estoppel is asserted as arising from another's silence, the person maintaining such silence must have been under a duty to speak before estoppel will lie. Wisler v. Lawler, 189 U.S. 260, 270 (U.S. 1903), James v. Nelson, 90 F.2d 910, 917-918 (9th Cir. 1937) (quoting Nelson v. Chicago Mill & Lumber Corporation, 76 F.2d 17, 21 (8th Cir. 1935). See also Simpson Timber Co. v. Palmberg Constr. Co., 377 F.2d 380, 385 (9th Cir. 1967) (same under fraud analysis). At no turn does Google allege or even argue that Plaintiff owed to Google a duty to speak. Lacking this critical element, Google's equitable estoppel defense fails.

Those cases cited by Google in support of its argument that silence alone relate to arguments of acquiescence – not estoppel. One such case is Quinn v. City of Detroit, 23 F. Supp. 2d 741, 753 (D. Mich. 1998). In Quinn, Mr. Quinn, an attorney for the City of Detroit, developed a litigation management software program referred to as LMS. This development was done outside the scope of his usual work duties. After creating LMS, he uploaded it to the City of Detroit's legal department computers sometime in 1992. Soon thereafter, everyone in the legal department began using LMS to perform litigation management functions. This widespread use throughout the department continued with Quinn's knowledge for *more than three years*. Finally, upset about attempted changes to the software, and the legal department's assertion of proprietary rights in LMS, on November 20, 1995, Quinn scribed a letter to the department head. Therein, Quinn withdrew his permission for the City's use of LMS and instructed all software copies be removed from the City's computers. The City responded, asserting its rights to the LMS software and forbidding Quinn from authoring further changes to it. After registering copyright to the LMS software, Quinn brought suit for infringement the following year. Id. at 743-744.

After setting forth four equitable estoppel factors pursuant to Hampton v. Paramount Pictures Corp., 279 F.2d 100 (9th Cir. 1960), the Quinn court then compressed the separate – but related – equitable defense of acquiescence to fall within the ambit of estoppel: "'The plaintiff's acquiescence in the defendant's infringing acts may, if continued for a sufficient period of time and if manifested by overt acts result in an abandonment of copyright.' In such a case, the estoppel 'destroys the right asserted' and will be a defense for all acts occurring after the acquiescence. Id." Quinn, 23 F. Supp. 2d at 753 (quoting in part 1 M. Nimmer & D. Nimmer, Copyright §§ 13.07 (1990)). That said, the Quinn court found that, given Quinn's knowledge of the City's use of his LMS software for a period of at more than 3 years, during which time he never complained, Quinn acquiesced to the City's use of the LMS software and thus could not assert claims for infringement against the City. Id. Hence, the issue of plaintiff's silence in Quinn focused on silence throughout a years-long period of known use, thus leading to a finding of acquiescence.

The cases of Carson v. Dynegy, Inc. 344 F.3d 446 (5th Cir. 2003) and Keane Dealer Servs. v. Harts, 968 F. Supp. 944 (D.N.Y. 1997) are further cited by Google in support of its argument that Plaintiff induced Google to infringe by his silence. Both of these cases track the fact pattern of Quinn closely in that they involved former employees who provided software to a company, allowed the company to utilize the software for significant periods of time without complaint or notice, and then filed suit. See Carson, 344 F.3d at 448-451; Keane, 968 F. Supp. at 945-947.

The Federal Circuit succinctly stated the relationship between silence relative to a duty to speak, and that relative to a known acquiescence: "[S]ilence alone will not create an estoppel unless there was a clear duty to speak, (see Reay v. Raynor, 19 F. 308, 311 (C.C.S.D.N.Y. 1884)), or somehow the patentee's continued silence reenforces the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1043-1044 (Fed. Cir. 1992).

Those holdings of Quinn, Carson, and Keane cited by Google to support the notion that silence alone will support a finding of estoppel relate only to known acquiescence and are wholly

inapplicable to this matter. Moreover, the facts at issue in this matter are very much distinguishable from those at play in the referenced cases. Here, Google does not allege that it had utilized Plaintiff's works for any period of time without complaint from Plaintiff – silence of the type referenced to and relied upon in those cases. Google does not argue that Plaintiff remained silent for a period of time while Google used his works, thus creating a known acquiesence. Rather, Google asserts that it relied on Plaintiff's silence in failing to prevent Google from using Plaintiff's works from the get-go. See Motion at pp. 26, lines 22-24. It is this type of silence relied upon by Google which requires a duty to speak. The existence of such duty has never been averred or even argued by Google. Thus, because (1) Google's equitable estoppel defense is founded upon Plaintiff's silence, and (2) silence does not create an estoppel absent a duty to speak, and (3) Google fails to allege or even argue that Plaintiff had a duty to speak, Google's equitable estoppel defense/counterclaim fails as a matter of law.

### C. Google's indistinct implied license defense / counterclaim in meritless.

Citing to the same cases and providing the same arguments as it does for its equitable estoppel defense, Google attempts to discern a distinct argument for implied license. Google's reliance on these cases is misplaced. The Ninth Circuit has succinctly held that, under copyright law, whether an implied license has been created is a matter of state contract law interpretation. Foad Consulting Group, Inc. v. Musil Govan Azzalino, 270 F.3d 821, 827 (9th Cir. 2001). Critically, at no turns does Google cite to any state law – California or Nevada – to support its implied license argument. Thus, Google's implied license claim – which, regardless, is indistinct from its equitable estoppel claim – fails because there is absolutely no law cited to support such a claim.

Even the outmoded law cited by Google fails to support its implied license claim. Google refers to Effects Assocs., Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990) to support its implied license claim. In Effects Assocs., plaintiff created special effects movie footage at the request of defendant, then delivered that footage to defendant knowing defendant intended to include it in a movie such that it would be reproduced and distributed as movies do. Id. at 555-558. The court

focused on these factors and held that where an author has created a copyrighted work at the request of another and delivered that work to that person with knowledge of its putative infringing use (ie reproduction and distribution), the author grants an implied license to that person to utilize the works as per plan. Id. at 558-559.

The similar case of Herbert v. United States, 36 Fed. Cl. 299 (1996) to support its implied license claim. In Herbert, plaintiff created copyrighted works at the request of the defendant, then delivered those works to defendant, with knowledge of the defendant's goal to utilize the works in further publication. Id. at 302. Applying the same rationale as Effects Assoc., the court found that because the plaintiff created works at the request of the defendant and delivered them to defendant with knowledge of their putative use, an implied license for that use was granted to defendant. Id. at 310.

Thus, those outmoded cases cited by Google in support of its implied license argument stand only for the notion that where a putative infringer commissions the creation of copyrighted works, and the author delivers those works to the putative infringer with knowledge of that person's intended use, an implied license is granted for that use.

Critically, at no turn does Google argue that it requested of Plaintiff to create the works at issue in this case. For that reason alone, Google's implied license claim fails, as it is a necessary predicate to a finding of implied licenses under Effects Assoc. and its progeny. Further, at no turn did Plaintiff ever deliver to Google any copies of his copyrighted works. Google baldly asserts, without citation to competent evidence whatsoever: "[Plaintiff] manually submitted his site to Google, instructing the Googlebot to find and list the pages of his site in Google's search results." Per Google, this is tantamount to delivery of Plaintiff's works to Google. Tellingly, Google has set forth no evidence that Google knew of Plaintiff submitting his site for possible review by Google. Assuming for the sake of argument that such act could be construed as an attempt to deliver the works, there nevertheless would be no effected delivery as Google was unaware of any such site submissions until Plaintiff's deposition. No competent evidence goes to show otherwise. Quite simply, one may not have something delivered to him or her if he or

she is unaware of its arrival.

It has been shown that Google's implied license argument is not supported by state law references as required by Foad, supra. Further, even applying the outmoded law cited by Google, it is clear that no implied license to use Plaintiff's works was ever granted to Google. Thus, Google's implied license defense / counterclaim is void as a matter of law and summary judgment is appropriate thereon.

### D. Google's fair use defense / counterclaim fails as a matter of law.

After setting forth some background on the doctrine of fair use and the four factors to be considered in making a fair use determination, Google sets about a purported analysis of Kelly v. Arriba Soft Corp., 336 F.3d 811 (9th Cir. 2003). In Kelly, defendant operated a search engine which allowed its customers to search for pictures on the internet. To effectuate its purposes, the defendant utilized a software crawler to locate images on the internet. Once located, certain images would be copied back to defendant's servers. There, defendant's software would copy and shrink the image to what is referred to as a thumbnail – a much smaller sized image than the original – and then delete the original image. Id. at 815-817. The Ninth Circuit examined the procedural history of the case, wherein the district court had granted defendant's motion for summary judgment on the issue of whether creation of the thumbnail images was a fair use of plaintiff's works – the precise issue presented to the judge at the district court. However, the Ninth Circuit found that the judge's ruling therein, which deemed as fair use both the thumbnails and full-size copies of plaintiff's images, went too far. Id. at 816-817. As the issue of whether the reproduction of plaintiff's works in full-size format, the Ninth Circuit reversed and remanded for further proceedings. Id. at 822. However, the Ninth Circuit's withdrawn opinion in Kelly clearly showed the court's disposition to find that reproduction and distribution of full-size images would not be a fair use, should that matter arise on appeal. Kelly v. Arriba Soft Corp., 280 F.3d 934 (9th Cir. 2002) (not cited for precedential value).

The finding of fair use in Kelly turned on the transformative nature of thumbnail images – reduced in size, they served a different purpose than that of their full-size bretheren: to provide a

brief overview of the contents of an image, not the image itself. Because the thumbnails could not be blown-up without losing picture clarity, there was little harm in the thumbnails becoming replacements for full-size images. Floating on this analysis, the Ninth Circuit found making thumbnails of larger images to be fair use. Id. at 817-822. As will be shown below, while Google would hope to bootstrap the logic of this opinion, Google merely copied, without transformation whatsoever, Plaintiff's works.

### 1. Fair Use Analysis

The affirmative defense of fair use is inevitably raised in copyright infringement actions, here being raised as both an affirmative defense and declaratory relief counterclaim. Originally a common-law concept, fair use has been codified at 17 U.S.C. § 107. As fair use is a mixed question of law and fact, where there are no genuine issues of material fact – or after resolving disputed facts in favor of the opposing party no reasonable jury could find otherwise – a court may determine as a matter of law whether a challenged use is a fair use. Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F.3d 1110, 1115 (9th Cir. 2000). As shown below, here no genuine issues of material fact exist relative to a fair use inquiry. Thus, the court may appropriately determine as a matter of law that Google's verbatim reproduction and distribution of Plaintiff's creative works, without comment or criticism and for its own commercial purposes, is not a fair use of Plaintiff's works under copyright law.

Four factors play in making a fair use determination: (1) purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. As show below, none of these four factors favors Google in its use of Plaintiff's works.

    a.    <u>The purpose and character of Google's use</u>.

The first factor to be considered under a fair use analysis is the purpose and character of the use made of the works, and whether such use is commercial or for nonprofit educational

purposes. Id. at (1). The purpose and character arm of this inquiry may be guided by those uses mentioned in the preamble to section 107: comment, criticism, news reporting, teaching, scholarship or research. Campbell v. Acuff-Rose Music, 510 U.S. 569, 578 (U.S. 1994). The main focus of the purpose and character inquiry is to determine "whether the work merely 'supersede[s] the objects' of the original creation (citations omitted), or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" Id. at 579. A verbatim copy of a work serves no purpose but to supercede the objects of the original creation, thus there is nothing transformative about that verbatim use:

> There is little transformative about copying the entirety or large portions of a work verbatim. See Nihon Keizai Shimbun, supra, 166 F.3d at 72 (where the infringing news abstracts were "for the most part direct translations of Nikkei articles," the court held that the first factor "weighed strongly against fair use"); Infinity Broadcast Corp. v. Kirkwood, 150 F.3d 104, 108 (2d Cir. 1998) (holding that "there [was] no transformation" where defendant retransmitted original broadcasts over the telephone); Los Angeles News Service v. Reuters Television Int'l, 149 F.3d 987, 993 (9th Cir. 1998) (defendant's unauthorized copying of news footage "was not very transformative" because it did "not explain the footage, edit the content of the footage, or include editorial comment"); Sundeman v. The Seajay Society, Inc., 142 F.3d 194, 205-06 (4th Cir. 1998) (while it does not preclude a finding of fair use, "copying an entire work weighs against [such a] finding"); Princeton University Press v. Michigan Document Service, 99 F.3d 1381, 1389 (6th Cir. 1996) ("If you make verbatim copies of 95 pages of a 316-page book, you have not transformed the 95 pages very much -- even if you juxtapose them to excerpts from other works and package everything conveniently. This kind of mechanical 'transformation' bears little resemblance to the creative metamorphosis accomplished by the parodists in the Campbell case"), cert. denied, 520 U.S. 1156, 117 S. Ct. 1336, 137 L. Ed. 2d 495 (1997); Religious Technology Center v. Netcom On-Line Communication

Services, Inc., 923 F. Supp. 1231, 1243 (N.D.Cal. 1995) ("Netcom On-Line II") (defendant's posting of plaintiffs' copyrighted material on the Internet was "only minimally transformative since, unlike the typical critic, [defendant] adds little new expression to the Church's works")

L.A.Times v. Free Republic, 2000 U.S. Dist. LEXIS 5669 (Cen. D. Cal. 2000) at 24-26. Verbatim copying, without transformation whatsoever, seriously cuts against a finding of fair use. Worldwide Church of God, supra, 227 F.3d. at 117 (citing Weissmann v. Freeman, 868 F.2d 1313, 1324 (2d Cir. 1989)).

Here, Google has merely copied – verbatim – Plaintiff's works and distributed those copies to the internet user requesting them. Depo. Brougher at pp. 114, lines 9-25; pp. 115, lines 1-4; pp. 77, lines 19-25 and pp. 78, lines 1-3; See Exhibit "D". As it is verbatim copying, it adds nothing new to any of the works and hence there is nothing transformative about Google's use of the works. Worldwide Church of God, 227 F.3d at 117. Indeed, Google intends for its cache copies to serve as exact replacements for the originating webpages. According to Google:

> Google takes a snapshot of each page examined as it crawls the web and caches these as a back-up in case the original page is unavailable. If you click on the "Cached" link, you will see the web page as it looked when we indexed it.

See http://www.google.com/help/features.html#cached. It is evident that Google intends its cache pages to serve as replacements for the originating webpages. Such a use is merely superceding and not transformative. As the use is by no means transformative, this factor seriously cuts against a finding of fair use. Worldwide Church of God, supra.

The next arm of the purpose and character factor test is whether the use is for commercial or for nonprofit educational purposes. Here, Google will argue that because it was not selling Plaintiff's works, its use of the works was not for commercial purposes. Insofar as the law is concerned, such a view is fatally myopic: "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Id. at 1117 (Citing Harper & Row, 471 U.S. at 562.) In Worldwide Church of God, the Ninth Circuit joined with

the Second Circuit's notion that monetary gain is not the sole criterion to determine whether one is profiting from a use, particularly in circumstances where gain are not easily measured in terms of a dollar amount. 227 F.3d. at 1117-1118. The Court in Worldwide Church of God determined that a nonprofit religious group which reproduced and distributed copyrighted texts to its disciples free of charge was nevertheless engaged in a commercial use of the text. Id. In so holding, the Ninth Circuit noted that the use attracted new members to the church and supported its growth. Id. Critically, the Court found: "It is beyond dispute that [Defendant] "profited" from copying [the text]- it gained an 'advantage' or 'benefit' from its distribution and use of [the text] without having to account to the copyright holder." Id.

Here, Google's use of Plaintiff's works is undeniably commercial in nature. Google is a for-profit company. See Answer at ¶ 6. The cache functionality provided by Google serves as a draw for internet users to utilize Google for their information retrieval needs. Depo. Brougher at pp. 74, lines 3-11. Not surprisingly, the more users Google has, the more revenue potential Google realizes as a result of those users. Depo. Brougher at 71, lines 21-22. Indeed, Google searches, which invariably contain links to cached pages, also contain what Google refers to as Sponsored Links – links that when clicked provide revenue to Google. Depo. Brougher at pp. 76, lines 2-10. Hence, even though Google did not outright sell Plaintiff's works, it did include them in a service which acts as a draw to internet users to use Google's proprietary web search features. Such a use is clearly commercial in nature. Thus, this factor likewise weighs against Google.

b. The nature of the copyrighted works

This second factor of the fair use analysis focuses on whether the works used are factual/scientific works, or whether the works are fictional/creative. That a work is fictional/creative in nature mitigates against a finding of fair use:

> In general, fair use is more likely to be found in factual works than in fictional works. See 3 Nimmer § 13.05[A], pp. 13-77 to 13-78 ("[A]pplication of the fair use defense [is] greater . . . in the case of factual works than in the case of works of fiction or fantasy"); cf. Harper & Row, supra, at 563 ("The law generally recognizes a greater need to diseminate factual works than works of fiction or

fantasy").

Stewart v. Abend, 495 U.S. 207, 237-238 (U.S. 1990). At issue in Stewart was a movie based upon a fictional short story. The Court found that such a work was obviously a fictional/creative work. Id. Because the nature of the work in Stewart was a fictional/creative work, the Court concluded that this weighed against a finding of fair use. Id.

Here, like Stewart, Plaintiff's works are fictional and creative in nature. Hence, this factor weighs against a finding of fair use.

  c. <u>The amount and substantiality of the portion used in relation to the copyrighted work as a whole.</u>

This third factor under the fair use analysis considers whether a the whole other merely a part of a work has been utilized by the putative infringer. Not surprisingly, verbatim copying seriously mitigates against a finding of fair use. Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F.2d 1148, 1155 (9th Cir. 1986) Further, "the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression." Worldwide Church of God, supra, at 1118 (quoting Harper & Row, 471 U.S. at 565).

Here, Google has merely copied – verbatim – Plaintiff's works and distributed those copies to the internet user requesting them. Depo. Brougher at pp. 114, lines 9-25; pp. 115, lines 1-4; pp. 77, lines 19-25 and pp. 78, lines 1-3; See also Exhibit "D"; Counterclaim at ¶ 31-32; Google's Responses to Requests for Admission, nos. 52-103. Thus, this third factor weighs against a finding of fair use.

Google cites to Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417 (U.S. 1984), as standing for the proposition that fair use is often found when the entirety of a work is reproduced by a putative infringer. Importantly, the Sony decision relates solely to contributory copyright infringement and has never been applied to a direct infringement action such as this.

      d.    <u>The effect of the use upon the potential market for or value of the copyrighted work</u>.

Notwithstanding the fourth factor, the previous three factors alone support finding that Google's use is not a fair use: "We have found no published case holding that fair use protected the verbatim copying, without criticism, of a written work in its entirety." <u>Worldwide Church of God</u>, 227 F.3d at 1120.

This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." <u>Campbell v. Acuff-Rose Music</u>, 510 U.S. 569, 590 (U.S. 1994) (citing Nimmer § 13.05[A][4], p. 13-102.61; <u>Harper & Row</u>, supra, 471 U.S. at 569). With regard to this factor, where, as here, the infringer's use is for commercial purposes (as discussed above), market harm is to be presumed. <u>Sony Corp. of America v. Universal City Studios, Inc.</u>, 464 U.S. 417, 451 (U.S. 1984). As Google's use of Plaintiff's works was for commercial purposes, market harm is to be presumed, and thus this factor likewise weighs against a finding of fair use.

Even without the aforementioned presumption, this factor would nevertheless weigh against a finding of fair use. There is no question that unrestricted and widespread reproduction and distribution of Plaintiff's works, verbatim and in their entirety, would absolutely supplant the potential market for the original works. At that point, Plaintiff would have no control over the copying and dissemination of his works, thus leaving him without a market to exploit whatsoever. Thus, even if there were no presumption of market harm, were Google's use of Plaintiff's works to become widespread and unrestricted, there is no doubt that Plaintiff's market for the works would be totally eradicated. Therefore, anyway one cuts it, this factor likewise weighs against fair use.

    e. <u>Conclusion Regarding Fair Use</u>

As the <u>Worldwide Church of God</u> Court put it: "We have found no published case

Page 16 of 18

holding that fair use protected the verbatim copying, without criticism, of a written work in its entirety." 227 F.3d at 1120. Such circumstances are equally applicable here. The foregoing analysis proves that not one of the four fair use factors favors Google in this instance. Therefore, the Court must grant summary judgment to Plaintiff on this issue.

### III. CONCLUSION

It has been shown above that Google may be liable for direct infringement, and that its defenses of implied license, fair use, and equitable estoppel are without merit. Therefore, this court should reject Google's Motion for Summary Judgment in its entirety.

Dated this 17th day of October, 2005.

_____
BLAKE A. FIELD
9805 Double Rock Dr.
Las Vegas, NV 89134
702.373.1022
Pro Se Plaintiff

## CERTIFICATE OF MAILING

I hereby certify that the foregoing Opposition to Defendant/Counterclaimant Google, Inc.'s Motion for Summary Judgment was served via US Mail, postage prepaid, upon the following:

Kelly Evans
Snell and Wilmer
3800 Howard Hughes Pkwy Suite 1000
Las Vegas, NV 89109

David Kramer
Wilson Sonsini Goodrich & Rosati
650 Page Mill Rd.
Palo Alto, CA 94304

_____
Blake A. Field