ORIGINAL

2005 NOV -7  A 11: 10

Kelly A. Evans
Nevada Bar No. 7691
SNELL & WILMER L.L.P.
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, NV  89109
Telephone (702) 784-5200
Facsimile (702) 784-5400

David H. Kramer (Admitted Pro Hac Vice)
William O'Callaghan (Admitted Pro Hac Vice)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA  94304-1050
Telephone (650) 493-9300
Facsimile (650) 493-6811

Attorneys for Defendant GOOGLE INC.

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

BLAKE A. FIELD,

                    Plaintiff,

vs.

GOOGLE INC.,

                    Defendant.

AND RELATED COUNTERCLAIMS

No. CV-S-04-0413-RCJ-GWF

**MEMORANDUM OF POINTS AND AUTHORITES IN SUPPORT OF GOOGLE INC.'S MOTION FOR SUMMARY JUDGMENT**

. . .

. . .

. . .

. . .

. . .

. . .

Snell & Wilmer
L.L.P.
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702) 784-5200

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2 **I.    INTRODUCTION**

3      The plaintiff in this case, Blake A. Field, is a member of the bar who freely admits that

4 he has attempted to manufacture a multimillion dollar copyright infringement claim against

5 Google Inc. ("Google"), the provider of the world's most popular Internet search engine.  Field

6 seized upon this scheme in December 2003.  He knew that when Google lists an Internet Web

7 page in its search results, it provides a prominent hyperlink (a "link") to that page and typically

8 includes a less conspicuous link for the page labeled "Cached."  By clicking on the "Cached"

9 link for a page, an Internet user can access and retrieve Google's archival copy of that page

10 which is stored in Google's system cache.

11      The archival copy of pages that Google holds are created when Google's automated

12 Web crawler (the "Googlebot") visits a site for purposes of analyzing and including the page in

13 Google's search results.  Google affords a "Cached" link to this archival copy so that users can

14 access the page when the originating site is otherwise inaccessible, so that users can analyze

15 whether and how a page has been altered over time, and so that users can easily determine why

16 a page was deemed responsive to a particular search query.  Google has operated its system

17 cache in this manner for years to considerable praise and nary a complaint.

18      Field readily acknowledges that the archival copies of Web pages that Google makes

19 and stores in automated fashion do not infringe the copyrights on those pages.  He objects,

20 however, to Google's offering users a link to its archival copies of pages.  Field hypothesizes

21 that when Internet users click on the "Cached" link and retrieve a page from Google's cache,

22 Google infringes the copyright in the page by creating or distributing a copy of the page.

23      In January 2004, Field conceived of a get-rich-quick plan based on this hypothesis.  He

24 hastily jotted down 51 "literary works" for which he registered copyrights.  He then created a

25 Web site and posted these works on pages within the site, making them publicly available for

26 free.  Next, Field expressly informed Google of his Web site and explicitly requested that

27 Google automatically visit and index the pages within his site so that they would be included in

28 Google's search results.  Field knew full well that when Google included his pages in search

Snell & Wilmer
L.L.P.
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702) 784-5200

1  results, it would automatically present "Cached" links to those pages unless Field followed

2  simple, industry-standard procedures to request that Google not do so.  Nevertheless, Field

3  never once communicated any objection to Google's long-standing automated process.  Indeed,

4  as part of his scheme, Field deliberately chose not to include the industry-standard notifications

5  on the pages of his site to ensure that Google would present "Cached" links for those pages.

6       As Field expected and desired, the Googlebot automatically copied the Web pages

7  containing his writings and included them in Google's Web index.  When those pages were

8  displayed as search results, Google included the prominent link to the pages on Field's site,

9  along with the understated "Cached" link to its archival copy of those pages.  Field himself then

10  clicked on the "Cached" links for each of the pages containing his copyrighted works, and

11  retrieved a copy of those pages from Google's system cache.  Remarkably, Field now claims in

12  this lawsuit that by allowing him to retrieve copies of his own works at his express request,

13  Google has infringed his copyrights.  Field demands $2,550,000 in statutory damages.  These

14  facts are undisputed, and demonstrate that Field's suit is entirely contrived.  It is also entirely

15  without merit.

16       First, Google has not infringed the copyrights on Field's works because it neither made

17  nor distributed copies of those works.  Rather, the copies of the works at issue were created by a

18  user (*i.e.*, Field) who accessed the works and retrieved a copy of them from Google's system

19  cache by clicking on Google's "Cached" links.  Google's conduct in presenting links to those

20  works is simply not an act of copyright infringement.

21       Second, even if Google could be viewed as having made or distributed these copies of

22  Field's works, Field impliedly granted Google permission to do so.  Field displayed his site on

23  the Internet without including any label, including those that are industry standard, to instruct

24  Google not to present "Cached" links to the pages containing his works.  This was no oversight.

25  Field knew about these industry-standard labels and deliberately avoided using them, knowing

26  that Google would interpret their absence as permission to present "Cached" links.  Field also

27  expressly requested that Google include the pages of his site in its search results, again knowing

28  that Google would automatically include "Cached" links for those pages unless Field instructed

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1    otherwise.  As if that were not enough, Field himself then requested copies of the pages (and his

2    works) by clicking on the "Cached" links that he knowingly permitted Google to display.  For

3    each of these reasons, Field impliedly licensed any copies of his works retrieved from Google's

4    system cache.

5         Third, Google relied upon Field's acts and omissions in allowing access to his works

6    through its "Cached" links.  Field made his copyrighted works available to the world for free on

7    the Internet, and expressly submitted the pages containing them to Google.  In the process he

8    deliberately omitted labels from those pages, expecting and intending that their omission would

9    cause Google to display "Cached" links for those pages.  Field then clicked on the "Cached"

10   links for the pages containing his works, thereby creating the very copies about which he now

11   complains.  Under these circumstances, Field is estopped from claiming infringement as a

12   matter of law.

13        Finally, Google's allegedly infringing activity is protected under the fair use doctrine.

14   As the Supreme Court held in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S.

15   417, 450 (1984), the "purpose of copyright is to create incentives for creative effort."  The fair

16   use doctrine recognizes that a "use that has no demonstrable effect upon the potential market

17   for, or the value of, the copyrighted work need not be prohibited in order to protect the author's

18   incentive to create"; and to prohibit such use would be to "merely inhibit access to ideas

19   without any countervailing benefit."  *Id.* at 450-51.  That is precisely the case here.  By

20   providing "Cached" links for pages whose authors display them for free to the world on the

21   Internet, Google serves important, transformative purposes that are not served by the original

22   page.  Specifically, Google's "Cached" links facilitate public access to Web pages when the

23   originating page becomes unavailable.  "Cached" links also allow the public to view an archival

24   copy of a page and thereby identify potentially significant changes made to the page over time.

25   They further enable researchers to more easily understand why particular Web pages were

26   identified in response to a particular search.  There is certainly no evidence that Google's

27   "Cached" links in any way harmed the value of, or potential market for, Field's works.  As a

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1  matter of law, any alleged infringement by Google of Field's works was a non-infringing fair

2  use.

3         For each of these reasons, Google is entitled to summary judgment on Field's copyright

4  infringement claims.

5  **II.     STATEMENT OF UNDISPUTED FACTS**

6         **A.     Google And "Cached" Links.**

7         Google's corporate mission is to "organize the world's information and make it

8  universally accessible and useful." As one step in fulfilling that mission, Google maintains one

9  of the world's largest and most popular Internet search engines, accessible, among other places,

10  on the World Wide Web at www.google.com. *See* Brougher Decl. ¶2. Internet search engines

11  like Google's allow Internet users to sift through the massive amount of information available

12  on the Internet to find specific information that is of particular interest to them. *See id.* ¶3; *see*

13  *also* Levine Report ¶13.

14         There are *billions* of Web pages accessible on the Internet. It would be impossible for

15  Google to locate and index or catalog them manually. *See* Brougher Decl. ¶¶3-4; *see also*

16  Levine Report ¶¶13-14. Accordingly, Google, and every other search engine, uses an

17  automated program (called a "bot," "crawler," or "spider") to continuously crawl across the

18  Internet, to locate and analyze available Web pages, and to catalog those Web pages into

19  Google's searchable Web index. *See* Brougher Decl. ¶¶4-5; *see also* Levine Report ¶14.

20         As part of this process, Google analyzes a copy of each Web page that it finds, and

21  stores those pages in Google's system cache. *See* Levine Report ¶14; Brougher Decl. ¶5.

22  Google's system cache is simply a temporary repository for storing copies of Web pages visited

23  by the Googlebot. *See* Brougher Decl. ¶7. Once Google indexes and stores a Web page in its

24  system cache, it can include links to that page, as appropriate, in the search results it displays to

25  users. *See id.* ¶5.

26

27

28

Snell & Wilmer
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

For example, if an Internet user were to search for information on Apple's new Macintosh "mini" computer (*e.g.*, using the phrase "apple mac mini review"), Google might return search results including the following listing:



*See* Brougher Decl. ¶9 & Ex. 1.  This listing prominently displays the title of the page ("Apple Mac mini review by PC Magazine") which, if clicked by the user, will take the user to that page.  The title is followed by a short "snippet" from the Web page in smaller font.  Following the snippet, Google typically provides the full URL for the page ("www.pcmag.com/article2/0,1759,1753962,00.asp").[1]  Finally, in the same smaller font, Google often displays another link labeled "Cached."  *See* Brougher Decl. ¶10.  This "Cached" link, and the consequences that flow when a user clicks on it, are the only subjects at issue in Field's lawsuit.

When clicked, the "Cached" link directs an Internet user to the archival copy of a Web page stored in Google's system cache, rather than to the original Web site for that page.  *See* Brougher Decl. ¶8.  By clicking on the "Cached" link for a page, a user can view the "snapshot" of that page as it appeared the last time the site was visited and analyzed by the Googlebot.  *See id.*

---

[1]   A Uniform Resource Locator ("URL") is simply the address on the Internet specified for a particular file, in this case, a Web page (*e.g.*, http://www.google.com).  *See, e.g.*, http://www.webopedia.com/TERM/U/URL.html.

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702) 784-5200

2733774_1.DOC

**B.     The Purposes Served By Google's Cache Functionality.**

Google enables users to access its copy of Web pages through "Cached" links for several reasons, all of which are consistent with its mission of making information on the Internet more accessible.[2]

Archiving

Google's "Cached" links allow users to view pages that the user cannot, for whatever reason, access directly.  A Web page can become inaccessible to Internet users because of transmission problems, because nations or service providers seek to censor certain information, because too many users are trying to access the same page at the same time, or because the page has simply been removed from its original location. *See* Levine Report ¶¶17-19.  In each case, users are still able to access an archival copy of the page via the "Cached" link in Google's search results. *See* Levine Report ¶¶17-19; *see also* Brougher Decl. ¶14.

Google's users, particularly those in academia, routinely describe this functionality as highly valuable. *See* Levine Decl. ¶4 & Ex. 2 (Maryland school district Web site describing Google cache as providing "a back-up in case the page's server temporarily fails"); *id.*, Ex. 3 at 5 (United Kingdom educational site describing how to use Google's cache: "The search engine keeps the text of the many documents it crawls available in a backed-up format known as 'cache.' A cached version of a web page can be retrieved if the original page is unavailable (for example, the page's server is down)."); *id.*, Ex. 4 at 23 (article entitled "*Using Google for African Studies Research*" explains that "Cached" link will allow access to a page "even though the original Web address may have changed, is no longer available, has moved elsewhere, or if the server is down . . . which can be useful for Web sites that suffer from frequent down-times, or for those elusive African journals that have Web sites which don't seem to work for most of the time or produce 'Not found' error messages.").  The State of Indiana has likewise recognized and actually educated its judges about this capability. *See* Levine Decl., Ex. 5 at 2

---

[2]     The three most popular search engines – Google, Yahoo!, and MSN – all display "Cached" links with their search results, and operate them identically. *See* Brougher Decl. ¶17; *see also* O'Callaghan Decl. Exs. 9-12.  Google, Yahoo!, and MSN collectively account for more than 80% of all Web searches. *See* Brougher Decl. ¶17.

2733774_1.DOC

Snell & Wilmer
L.L.P.
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1   (article entitled "*Maximizing Web Searches with Google,*" available at

2   http://www.in.gov/judiciary/center/ed/library/judcon-03/google.pdf, explains that "Clicking

3   'Cached' will simply give you an older version of the result page, which represents what the

4   page looked like the last time the Google engine indexed the page. This service exists in case a

5   website's server becomes unavailable."). As one technology columnist explained, "[the Google

6   cache] can be a miracle for anyone trying to find information on the Web." *See* Levine Decl.

7   Ex. 6 at 2 (article from The Syracuse Newspapers, explaining that "[i]f you're frustrated by sites

8   that seem to disappear, check out Google's cache. Chances are you'll find the page you're

9   looking for -- even if it's long gone.").

10       It is not merely users who appreciate this feature of Google's cache. This feature also

11   benefits Web site publishers because it allows users to access their sites when the sites are

12   otherwise unavailable. *See* Levine Report ¶¶16-19. Moreover, on countless occasions, the

13   Google cache has allowed Web site owners to recover copies of their own sites that might

14   otherwise have been lost to the world forever due to computer problems. *See, e.g.,* Levine

15   Decl. Ex. 7 at 2 (Wired article discussing how Web site operators use Google's cache to

16   reconstruct their own lost sites, quoting one as saying "Google saved my [neck]!").

17       Web Page Comparisons

18       This archival functionality is also of considerable importance to those who wish to

19   determine how a particular Web page has been altered over time. By examining Google's copy

20   of the page, teachers, librarians, politicians, attorneys, and a host of others can identify subtle

21   but potentially significant differences between the current version of a page, and the page as it

22   existed when last visited by the Googlebot. *See* Levine Report ¶20; *see also* Brougher Decl.

23   ¶15.

24       In one highly publicized example of this feature in action, the federal government

25   attempted to revise its online description of the "Total Information Awareness System,"

26   following criticism about its privacy implications. Critics and the media were able to access the

27   original version of the government's page through the Google cache, and preserved it for

28   purposes of criticism. *See* Levine Decl., Ex. 10 (identifying Web pages that were removed

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1  from IAO Web site on 11.26.02 and retrieved from the Google cache on 12.02.02); *see also id.*,

2  Ex. 11 at 1 (Wired article related to Taliban Web site that relied upon a version of the Web site

3  "resurrected by Google's cache").

4    Identification of Query Terms

5    Google's "Cached" links also allow users to immediately determine why a particular

6  page was deemed responsive to their search query by highlighting the terms in the user's query.

7  *See* Levine Report ¶17; *see also* Brougher Decl. ¶16. In some cases, if a user clicks on

8  Google's link to an original Web page, he may be unable to determine how the page relates to

9  his inquiry. That is particularly true for text intensive pages where the user's search term may

10 be very difficult to find. *See* Levine Report ¶17; *see also* Levine Decl. Ex. 13 at 1 (online

11 marketing service providing tips on using Google's cache: "Sometimes you are looking for a

12 detail on a page that turns out to be 5 miles long. Using the cached link will highlight the

13 words you searched for in Google."). In fact, it may be impossible to find the information on a

14 page that is responsive to a given search where a site owner has altered the text on the original

15 page and removed relevant language that was present previously. *See* Levine Report ¶17; *see*

16 *also* Brougher Decl. ¶16.

17    To address these common issues, Google allows users to access its archival copy of a

18 page. Because it controls its archival copy, Google can automatically highlight the user's query

19 in the copy that the user then retrieves. Accordingly, Google enables users to more quickly

20 determine where the relevant language appears, and thus whether the page is truly germane to

21 their inquiry. For example, if an Internet user clicked on the "Cached" link for a Web page that

22 Google returned on the search for "apple mac mini review," Google would return the following:

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1

This is G o   g l e's cache of http://www.dnaisiontwo.com/articles/MacMini2.html as retrieved on Sep 8  2005 03 02 22 GMT

2

G o   g l e's cache is the snapshot that we took of the page as we crawled the web
The page may have changed since that time  Click here for the current page without highlighting
This cached page may reference images which are no longer available  Click here for the cached text only

3

To link to or bookmark this page  use the following url  http://www.google.com/search?
q=cache:ImNm3h7uf9OJ:www.divasiontwo.com/articles/MacMini2.html+apple+mini+mac+review&hl=en

4

*Google is neither affiliated with the authors of this page nor responsible for its content*

These search terms have been highlighted  apple **mini mac**

5

These terms only appear in links pointing to this page  **review**

6

**Mac Mini** The Emperor's New Computer
by Jorge Lopez, MCSE

**Technology Insider**
©2005 Divasiontwo Magazine

7



**Apple** is a master at hype  everyone knows this  Its founder  Steve Jobs  is well-known throughout the industry for possessing a 'reality distortion field' which makes people crave **Apple** computers and one-button mice despite their exorbitant price and in the face of all rational logic  Both the **Apple** hype mac and Jobs' reality distortion field have kicked into overdrive this year with the recent release of the bold innovative and affordable G4 Cube  oops I mean the **Mac mini**

8

9

I'll admit  we were excited at first to get one in the lab to put through its paces  I had heard about the machine and seen a few clips on G4 of Steve Jobs' keynote at Macworld San Francisco in January  My curiosity piqued by the pronouncement of a $499 computer from **Apple**  I checked out **Apple** com to look up its specs  While the hardware is about roughly equivalent to a Windows PC circa 1995  what got me interested were **Apple**'s claims about its size  weight and footprint

10

11

*The faithful: A set of praying hands exalts **Mac mini** to the heavens.*

12

13   *See* Brougher Decl. ¶11 & Ex. 2.  Again, the cached page shows the original page as it existed

14   when it was analyzed by Google, but with the user's search terms highlighted (*e.g.*, the term

15   "Apple" is highlighted in yellow; "Mac" is highlighted in cyan; "mini" is highlighted in green).

16   *See id.*

17          As the illustration shows, the page a user retrieves after clicking on a "Cached" link

18   contains a prominent disclaimer at the top explaining that it is only a snapshot of the page from

19   Google's cache, not the original, and that it may not be current. *See* Brougher Decl. ¶¶11-12 &

20   Ex. 2 ("Google's cache is the snapshot that we took of the page as we crawled the Web.  The page

21   may have changed since that time.").  Google's disclaimer includes two separate links to the

22   original, current page. *See id.*  The first appears on the first line of the disclaimer as the URL for

23   the current page which, if clicked, will take the user there.  The second link simply states "Click

24   here for the current page."  Both operate to ensure that the user is truly interested in viewing the

25   archival copy, and that the user can reach the current page directly if he so desires.

26          Google has provided "Cached" links with its search results since 1998. *See* Brougher

27   Decl. ¶7.  Web site owners have been highly appreciative of the feature, as it allows users to

28   access their sites when they otherwise could not.  And despite offering the functionality for

Snell & Wilmer
L.L.P.
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702) 784-5200

2733774_1.DOC

1  billions and billions of pages during this period, Google had never before been sued for

2  providing "Cached" links. *See* Macgillivray Decl. ¶3.

3  **C.      There Are A Host Of Methods That Site Owners Can Use To Tell Search**
         **Engines Whether To Provide "Cached" Links For Their Web Pages.**

4

5      Given the breadth of the Internet, it is simply impossible for Google (or other search

6  engines) to personally contact every Web site owner to determine whether the owner wants the

7  pages in its site listed and cached in Google's search engine. *See* Brougher Decl. ¶18; *see also*

8  Levine Report ¶25. Accordingly, long ago, the Internet industry developed a set of standard

9  protocols by which Web site owners could automatically communicate their preferences to

10 search engines such as Google. *See* Levine Report ¶25; *see also* Brougher Decl. ¶18.

11     Of relevance here, there are at least five different ways that Web site owners can tell

12 Google whether Google's automated robot is allowed to index and cache the owner's Web page:

13 (1) meta-tags; (2) a robots.txt file; (3) access controls; (4) removal requests; and (5) contacting

14 Google directly. The first two methods are widely recognized and well-publicized industry

15 standards, known throughout the Internet community. *See* Levine Report ¶¶25, 29, 35 (listing

16 sources that document these standards); Brougher Decl. ¶¶18-21. Google provides instructions

17 on all five methods on its Web site at http://www.google.com/remove.html. *See* Levine Report

18 ¶¶30, 35; Brougher Decl. ¶¶18-21; O'Callaghan Decl. Ex. 5; *see also id*. Exs. 4, 6.

19     **1.      Meta-Tags.**

20     The first and perhaps easiest way for Web site owners to communicate with Google's

21 robot is by placing specific instructions in "meta-tags" within the computer code (called

22 HTML) that comprises a given page. When the Googlebot visits a page, it reads through this

23 code. If it encounters meta-tags, it follows the instructions provided. Thus, for example, a site

24 owner can place the following meta-tag within a page to tell Google's robot not to analyze the

25 page or include it in Google's Web index and search results:

26     <META NAME="ROBOTS"  CONTENT="NOINDEX, NOFOLLOW">

27 *See* Brougher Decl. ¶20; *see also* Levine Report ¶33.

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1    Using meta-tags, a Web site owner can also tell Google's robot that it can include a

2  given page in Google's index, but that it should not provide a "Cached" link to that page in

3  Google's search results.  To do so, the Web site owner uses the "no-archive" meta-tag shown

4  below:

5            <META NAME="ROBOTS"  CONTENT="NOARCHIVE">

6  *See* Brougher Decl. ¶21; *see also* Levine Report ¶35.  The "no-archive" meta-tag has been a

7  widely recognized industry standard for years.  *See* Levine Report ¶35.[3]

8    If a Web site owner includes the "no-archive" meta-tag on a page, then Google does *not*

9  provide a "Cached" link when it lists that page in its search results.  *See* Brougher Decl. ¶¶21-

10  22.  The following example, reflecting search results for the phrase "apple mac mini review," is

11  illustrative:



24  *See* Brougher Decl. ¶22 & Ex. 1.  As the illustration shows, the first two results have "Cached"

25  links to the right of the URL for the Web page.  However, for the last entry ("Tom's Hardware

26  _____

27        [3]    A Web site owner can add the "no-archive" meta-tag in a matter of seconds.  *See*
    Brougher Decl. ¶21.  Web site owners can also use a Google-specific "no-archive" meta-tag to tell
28  Google that it cannot provide "Cached" links, while allowing other search engines (*e.g.*, Yahoo!
    and MSN) to do so.  *See id.*; *see also* Levine Report ¶35.

Snell & Wilmer
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

2733774_1.DOC

1   Guide PCs & HowTo"), there is no "Cached" link.  That is because the Tom's Hardware Guide

2   Web page includes a "no-archive" meta-tag that Google has read and obeyed.  *See* Brougher

3   Decl. ¶22 & Exs. 3-4.

4              **2.    Robots.txt File.**

5          The second way that Web site owners can communicate with search engines' robots is

6   by placing a "robots.txt" file on the owner's Web site.  *See* Brougher Decl. ¶19; *see also* Levine

7   Report ¶29.  For example, if the Web site owner does not want robots to crawl the owner's Web

8   site, the owner can create a robots.txt file with the following text:

9          User-agent: *

10         Disallow: /

11  *See* Brougher Decl. ¶19; *see also* Levine Report ¶29.  The above text tells the robots that they

12  should not crawl the owner's Web site.  *See* Brougher Decl. ¶19; *see also* Levine Report ¶29.[4]

13  If Google's robot encounters a robots.txt file with the above text, then it will not crawl the Web

14  site, and there will be no entry for that Web page in Google's search results and no cached link.

15  *See* Brougher Decl. ¶19.  The Internet industry has widely recognized the robots.txt file as a

16  standard for controlling automated access to Web pages since 1994.  *See* Levine Report ¶29.

17             **3.    Access Controls.**

18         The third way that Web site owners can communicate with search engine robots is by

19  using access controls on a Web page.  *See* Brougher Decl. ¶25; *see also* Levine Report ¶34.

20  Most Web pages are publicly available to anyone with a Web browser.  However, a Web site

21  can adjust the permissions for some or all of its pages to require a user name and password.  *See*

22  Brougher Decl. ¶25; *see also* Levine Report ¶34.  If the Googlebot encounters a password-

23  protected Web page, it cannot access the Web page and thus does not copy, index or cache that

24  page.  *See* Brougher Decl. ¶25.

25

26         [4]      Web site owners can also use a search engine-specific "robots.txt" file to tell
27  Google that it cannot index pages within a site while allowing other search engines (*e.g.*, Yahoo!
    and MSN) to do so.  Site owners can also permit a search engine to index only certain pages
28  within a site.  *See* Brougher Decl. ¶¶19-20; *see also* Levine Report ¶33.

Snell & Wilmer
L.L.P.
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1

### 4.   Automated Removal Procedure.

2      If the Web site owner fails to use any of the the first three methods to communicate with

3   Google, the owner can simply request that Google not display "Cached" links for given pages

4   by using Google's automatic URL removal procedure. *See* Brougher Decl. ¶23.  Google's Web

5   site provides step-by-step instructions on using this procedure. *See id.*; *see also* O'Callaghan

6   Decl. Ex. 5 (attaching a printout of http://www.google.com/remove.html).

7            ### 5.   Contacting Google Directly.

8      Finally, a Web site owner can contact Google (*e.g.*, by email) to ask that Google not

9   provide "Cached" links to the owner's Web pages. *See* Brougher Decl. ¶24.  An owner can

10  even make such a request prospectively, before the Googlebot visits its sites, to prevent its

11  pages from ever being included or cached. *See id*.  It can also make such a request after a page

12  has been indexed and cached, either to remove a page from Google's index or to ask Google not

13  to provide a "Cached link" for the page.  In either case, Google honors such requests. *See id*.

14  ### D.   Plaintiff Blake Field And His Copyright Scheme.

15     Plaintiff Blake Field has regularly used Google's search engine over the past several

16  years and was familiar with the manner in which it operates. *See* Field Depo. at 103:15-20.  In

17  particular, Field has long been aware that Google automatically provides "Cached" links for

18  pages that are included in its index and search results, unless instructed otherwise. *See id*. at

19  74:8-22, 109:22-110:6.  Field decided to concoct a claim in the hopes of making money from

20  Google's long-standing practice. *See. id*. at 79:8-15, 141:15-24.

21     Field admits he knew that any Web site owner could instruct Google not to provide a

22  "Cached" link to a given Web page by using the "no-archive" meta-tag (as discussed in Section

23  II.C.1, *supra*). *See* Field Depo. at 74:8-22 ("I was aware at the time of the meta[-]tag that one

24  can insert on each of one's pages that can specifically instruct Google not to cache one's

25  page."), 81:13-17.  He also admittedly knew that Google provided a process to allow Web site

26  owners to remove pages from Google's system cache. *See id.* at 81:18-21, 83:4-11, 84:15-21;

27  O'Callaghan Decl. Ex. 3 at 1-2 (Plaintiff's Responses to Request for Admission Nos. 1, 4).

28

Snell & Wilmer
L.A.W. OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

2733774_1.DOC

1    With this knowledge, Field set out to get pages from his own Web site containing copyrighted

2    works included in Google's index, and to have Google provide "Cached" links to those pages.

3    <u>Step One</u>

4    Field's first step was to manufacture copyrighted works.  Field spent only three days in

5    January 2004 creating the 51 "literary" works at issue in this lawsuit.  *See* O'Callaghan Decl.

6    Ex. 2 (Plaintiff's Response to Interrogatory No. 5).  The term "literary" is used loosely.  The

7    works at issue consist exclusively of Field's stream-of-consciousness ramblings on such topics

8    as "Good Burritos," "Antiperspirant," and "Box of Macaroni."  The "Good Burrito" work, for

9    example, begins:  "There?s [sic] this burrito joint that?s [sic] not too far from here, and they

10    make a pretty good burrito.  It?s [sic] also a very inexpensive burrito, as their cadillac entre is

11    the most expensive at $4.10."  *See* O'Callaghan Decl. Ex. 11 at 2; *see also*

12    http://www.blakeswritings.com/GoodBurritos.html.

13    Field registered copyrights for each of these "works" separately on January 16, 2004.

14    *See* First Amended Compl. ¶7.[5]  Field then created a Web site at www.blakeswritings.com and

15    included his works on pages where they were accessible, for free, to the world starting in late

16    January 2004.  *See* Field Depo. at 45:2-4, 94:10-19.

17    <u>Step Two</u>

18    The next step in Field's scheme was to get the pages containing his copyrighted

19    ramblings included in Google's Web index and search results, where he knew they would then

20    be accessible via "Cached" links.  Almost immediately after his site went live, Field took a

21    number of steps to ensure that Google's robot would visit his site and index its pages.

22    <u>First</u>, Field manually submitted his site to Google.  That is, he specifically informed

23    Google of the site's existence and expressly asked Google to include its pages in Google's

24

_____

25         [5]    Field apparently applied to register the works and then waited to publish them on pages of his site to ensure that they would be registered by the time the Googlebot visited his site

26    and included "Cached" links to the pages in Google's search results.  Recognizing that Google's processes would not cause him any actual injury, Field engaged in these machinations so that he

27    could assert that his copyrighted works were registered and thus claim statutory damages for the supposed infringement of his copyrights.  *See* 17 U.S.C. § 412(2) (2005) (barring award of

28    statutory damages for alleged infringement commenced after first publication and before registration, unless registration follows promptly thereafter).

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1   search results.  He did this by filling out a form on Google's site set up for this purpose.  *See*

2   Field Depo. at 99:1-10; *see also* Brougher Decl. ¶6 (explaining Google's self-submission form).

3        Second, Field created a robots.txt file for his site and set the permissions within this file

4   to *allow* all robots to visit and index all of the pages on the site.  *See* Field Depo. at 46:10-16;

5   Levine Report ¶31.  Field explained that he created the robots.txt file because *he wanted search*

6   *engines to crawl his site*.  *See* Field Depo. at 46:2-4, 46:17-23.  At the same time, Field avoided

7   any access control mechanisms on his site so that everyone, including the Googlebot, could

8   access and retrieve a copy of it.  *See id.* at 94:13-19.

9        Third, Field purchased paid advertisements for his site through Google, hoping that this

10  would lead Google to quickly find the pages on his site and include them in its search results.

11  *See* Field Depo. at 100:10-101:9, 98:18-25.[6]

12       Again, in taking each of these steps, Field knew that when Google included the pages

13  from his site in its search results, it would automatically include "Cached" links to those pages

14  unless Field instructed otherwise.  *See* Field Depo. at 109:22-110:6.  Indeed, his clear goal was

15  to have Google present "Cached" links to those pages so that he could bring a claim for

16  copyright infringement against Google if someone then clicked on one of those links.

17       Step Three

18       For his scheme to work, Field had to make sure that Google would provide "Cached"

19  links for the pages containing his works.  Field knew that if he used the "no-archive" meta-tag

20  on the pages, that would not happen.  *See* Field Depo. at 81:13-17; O'Callaghan Decl. Ex. 3 at 2

21  (Response to Request for Admission No. 4).  Accordingly, *Field deliberately chose not to use*

22  *the "no-archive" meta-tag on his Web site*.  *See* Field Depo. at 83:25-84:3.  Further, Field

23  testified that he knew that Google provided a process that allowed Web site owners to remove

24  the "Cached" links for pages on their sites.  *See id.* at 81:18-21.  Again, *he consciously chose*

25  *not to use this functionality* either before or after the Googlebot visited and indexed the pages

26  on his site.  *See id.* at 83:4-19.

27

28      [6]    Field's assumption in this regard was wrong – the purchase of advertising does not
affect the operation of the Googlebot.  *See* Brougher Decl. ¶28.

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702) 784-5200

Step Four

1
2      Field's efforts achieved precisely the result he expected.  The Googlebot visited his site
3    and indexed its pages, making them available in Google search results.  When the pages
4    containing his "works" were displayed in Google's search results, they were automatically
5    displayed with "Cached" links, as Field knew and intended they would be.[7]
6      All that remained to complete Field's scheme was for someone to click on the "Cached"
7    links for the pages containing his copyrighted ramblings and retrieve a copy of those pages
8    from Google's system cache.  Apparently believing that no one else would be interested in
9    archival copies of his writings, however, Field himself clicked on the "Cached" links for each
10   of the pages, and retrieved copies of each of his own works from Google's system cache.  *See*
11   Field Depo. at 110:17-20, 111:3-9.  He filed this lawsuit against Google for copyright
12   infringement shortly thereafter.

13        **E.      Field's Copyright Infringement Lawsuit.**

14      When Google learned that Field had filed (but not served) his complaint, Google wrote
15   to Field explaining that Google had no desire to provide "Cached" links to Field's pages if he
16   did not want them.  Google informed Field that it had immediately removed the "Cached" links
17   to all of the pages.  *See* O'Callaghan Decl. Ex. 7; Field Depo. at 153:12-154:24; Counterclaims
18   ¶22; Answer to Counterclaims ¶22.  Field responded by serving his complaint on Google
19   demanding statutory damages, and amending his complaint to add 50 additional works he knew
20   had already been removed from Google's system cache, so that he could seek millions in
21   damages.  *See* First Amended Compl. at 6:5-6, 2:8-10 (seeking $50,000 in statutory damages
22   for each of Field's 51 copyrighted works).

23      According to Field, Google infringed his copyrights by "transmitting" copies of the
24   pages containing his works in Google's system cache to "individuals" that clicked on the

25   _____

26   [7]      Google was hardly the only search engine to provide "Cached" links for the pages
     of Field's site.  To this day, the Yahoo! and MSN search engines continue to provide "Cached"
27   links to www.blakeswritings.com.  *See* O'Callaghan Decl. Exs. 9-12.  Field was aware that the
     Yahoo! and MSN search engines generally include cached links, but he was not sure, as of the
28   date of his deposition, whether they provide cached links for his Web pages (they do), and had not
     investigated recently.  *See* Field Depo. at 166:2-167:22.

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1   "Cached" link for those pages. *See* Field Depo. at 144:2-17; O'Callaghan Decl. Ex. 2 at 9

2   (Response to Interrogatory No. 10). But as noted, Field is the only person to have ever clicked

3   on the "Cached" links for his works. *See* Field Depo. at 110:17-20, 111:3-9, 121:20-25;

4   O'Callaghan Decl. Ex. 2 at 9 (Response to Interrogatory No. 12). Thus, after manufacturing the

5   circumstances by which his works came to be accessible through Google's "Cached" links,

6   Field alone was responsible for the "transmission" that he claims is infringing. Indeed, Field

7   contends that Google infringed his copyrights solely by sending Field copies of his own works

8   in response to Field's express request. For that, Field demands $2.55 million in statutory

9   damages from Google.

10   **III.   ARGUMENT**

11       **A.   Summary Judgment Standard.**

12         Summary judgment is appropriate when there is no genuine issue of material fact and

13   the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *see also*

14   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue is "genuine" only if there is a

15   sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving

16   party, and a dispute is "material" only if it could affect the outcome of the suit under governing

17   law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

18         Once the moving party meets its initial burden of identifying for the Court materials that

19   it believes demonstrate the absence of a genuine issue of material fact, the nonmoving party

20   may not rely on mere allegations in the pleadings in order to preclude summary judgment. *See*

21   *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

22   Instead, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56,

23   specific facts showing that there is a genuine issue for trial. *See id.* "Where the record taken as

24   a whole could not lead a rational trier of fact to find for the non-moving party, there is no

25   'genuine issue for trial.'" *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

26   574, 587 (1986).

27         Courts have often resolved, on summary judgment, the issue of whether a defendant has

28   an implied license to use a copyrighted work. *See, e.g., Effects Assoc., Inc. v. Cohen*, 908 F.2d

Snell & Wilmer

555, 556, 558-59 (9th Cir. 1990) (affirming district court's decision to grant summary judgment that plaintiff granted defendant an implied license to use copyrighted work); *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (granting summary judgment that defendant had implied license to use copyrighted work). Courts also resolve estoppel defenses to copyright claims through summary judgment. *See, e.g., Carson v. Dynegy, Inc.*, 344 F.3d 446, 448 (5th Cir. 2003) (affirming district court's decision to grant summary judgment that plaintiff was estopped from asserting copyright claim); *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392, 1399-1400 (C.D. Cal. 1990) (granting summary judgment on defendant's estoppel defense).[8]   Similarly, the doctrine of fair use is routinely analyzed and applied through summary judgment proceedings. *See, e.g., Fisher v. Dees*, 794 F.2d 432, 435 (9th Cir. 1986) (affirming finding of fair use on summary judgment); *see also Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) (same); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003) (same; "[w]here material facts are not in dispute, fair use is appropriately decided on summary judgment").[9]

## B.   Field Has Failed To Identify Any Direct Copyright Infringement By Google.

Field's suit for copyright infringement fails for the simple reason that he cannot establish a case of infringement against Google. Field concedes that the copy of the pages from his site made by the Googlebot and stored in Google's system cache does not in any way infringe his copyrights. *See* Field Depo. at 143:13–144:1, 98:18-25. According to Field, however, Google committed copyright infringement when a user clicked on a "Cached" link to a page that contained his copyrighted work. Specifically, Field contends that when Google's

---

[8]      Estoppel and implied license are separate and independent defenses to copyright infringement. *See Carson*, 344 F.3d at 451-52, 453-55 (separately addressing defendant's estoppel and implied license defense). If Google prevails on either, it is a complete defense to Field's infringement claims. *See id.* (affirming summary judgment on defendant's estoppel defense, but not on implied license defense); *Effects Assoc.*, 908 F.2d at 559 n.7 (implied license is legal, not equitable defense).

[9]      In addition to these defenses, Google believes that the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, bars Field from recovering damages on his claims. Because these other grounds dispose of Field's case entirely, however, Google will bring a motion to strike or motion in *limine* based on § 512 at a later date, if necessary. 17 U.S.C. § 512 (2005).

Snell & Wilmer
L.L.P.
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1     computers automatically responded to a user's request for a page from Google's system cache,

2     Google made and distributed a copy of that page (containing Field's copyrighted work) without

3     Field's authorization. Google's conduct, according to Field, constitutes copyright infringement.

4     *See* First Amended Compl. ¶¶29-32.

5        Field's infringement theory is misguided. In reality, it is the user that creates and

6     retrieves a copy of a page by clicking on the "Cached" link for that page. Through that click,

7     the user sends a request for a page to Google's computers which respond automatically. *See*

8     Brougher Decl. ¶8. Google is entirely passive in the process. Without the user's request,

9     nothing would happen. Accordingly, it is the user who creates the copy in question, not

10    Google. *See In re Napster, Inc. Copyright Litig.*, Case No. C 04-2121 MHP, 2005 U.S. Dist.

11    LEXIS 11500, *21-22, 27-28 (N.D. Cal. June 1, 2005) (copyright infringement requires actual

12    transfer of copyrighted work; merely providing links through which users could access

13    copyrighted works is not direct infringement); *Sega Enters. Ltd v. MAPHIA*, 948 F. Supp. 923,

14    931-932 (N.D. Cal. 1996) (operator of electronic bulletin board system did not directly infringe

15    copyrighted works because it was the users (not the owner) who uploaded and downloaded

16    copyrighted works). While Google certainly plays a role in the process by which the copy is

17    created, its computer system is simply providing an automated response to the directions of the

18    user. Google's automated, non-volitional conduct does not constitute copyright infringement.

19    *See Religious Tech. Ctr. v. Netcom On-Line Communications Servs., Inc.*, 907 F. Supp. 1361,

20    1369-70 (N.D. Cal. 1995) (direct infringement requires a volitional act by defendant; automated

21    copying by machines occasioned by others not sufficient); *CoStar Group, Inc. v. LoopNet, Inc.*,

22    373 F.3d 544, 555 (4th Cir. 2004) ("Agreeing with the analysis in *Netcom*, we hold that the

23    automatic copying, storage, and transmission of copyrighted materials, when instigated by

24    others, does not render an ISP strictly liable for copyright infringement under §§ 501 and 106 of

25    the Copyright Act.").[10] Field's claim thus fails before any other issues are considered. *See*

26

            ———————————

27        [10]    Field also claims Google is "distributing" the copy that the user causes to be
created. Again, he is wrong. As a matter of law, providing a link to a copy of a work and

28    allowing others to retrieve a copy of the work by clicking on the link does not constitute
"distribution" of copies of the work within the meaning of the Copyright Act. *See In re Napster*,

                                                            (continued...)

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1 *Hayden v. Chalfant Press, Inc.*, 281 F.2d 543, 548 (9th Cir. 1960) (copyright owner has burden

2 of proving defendant's copying to establish infringement claim). Google is entitled to summary

3 judgment of non-infringement.

4 **C. Field Granted An Implied License Allowing Users To Obtain And Google To
Provide Access To Pages Containing His Copyrighted Works Via Google's
5 "Cached" Links.**

6 Even if Google were making and distributing copies of Web pages through its "Cached"

7 link functionality, Field's claim would still fail as a matter of law because Field impliedly

8 licensed Google to do so.

9 A license is a defense to a claim of copyright infringement. *See Effects Assoc.*, 908 F.2d

10 at 558-59. A copyright owner may grant a nonexclusive license expressly or impliedly through

11 his conduct. *See id.* (citing 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT

12 § 10.03[A] (1989) (hereinafter "NIMMER")); *see also Quinn v. City of Detroit*, 23 F. Supp. 2d

13 741, 749 (E.D. Mich. 1998).

14 Courts find an implied license exists as a matter of law where a copyright owner,

15 through its actions, has implicitly granted permission to use the copyrighted work. *See, e.g.*,

16 *Effects Assoc.*, 908 F.2d at 558-59. In the analogous context of a claim for patent infringement,

17 the Supreme Court has explained that "[a]ny language used by the owner of the patent or any

18 conduct on his part exhibited to another, from which that other may properly infer that the

19 owner consents to his use . . . constitutes a license, and a defense to an action . . . ." *See De*

20 *Forest Radio Telephone Co. v. United States*, 273 U.S. 236, 241 (1927). Courts likewise

21 recognize that a copyright owner grants an implied license to use a work when he: (1) knows a

22

23

24 (...continued from previous page)
25 2005 U.S. Dist. LEXIS 11500, at *21-22, 27-28; *see also Agee v. Paramount
Communications,Inc.*, 59 F.3d 317, 325-26 (2d Cir. 1995). Moreover, the specific "distribution"
26 right identified in the Copyright Act is "to distribute copies or phonorecords of a copyrighted
work to the public by sale or other transfer of ownership, or by rental, lease, or lending." *See* 17
27 U.S.C. § 106(3) (2005). "Copies" and "phonorecords" are both defined in 17 U.S.C. § 101 as
"material objects." *See* 17 U.S.C. § 101 (2005). There is no suggestion that Google either engages
28 in or assists in the distribution of any material objects.

1   defendant is using the work; and (2) remains silent or encourages such use. *See Keane*, 968 F.

2   Supp. at 946-47;[11] *Quinn*, 23 F. Supp. 2d at 749-50.[12]

3           **1.      Under Long-Standard Internet Protocols, Google Had An Implied
                     License To Allow Access To Field's Pages Through "Cached" Links.**
4

5           The permissions conveyed through implied licenses are essential to the operation of the

6   World Wide Web. Web site owners, for example, cannot possibly contract with every Internet

7   user who wishes to visit (and thus automatically create a copy of) the pages within their site.

8   That hardly means that users infringe the copyrights on every page they visit. Instead, the law

9   assumes that by virtue of taking the steps necessary to make a Web page accessible to users

10  over the Internet, a site owner is impliedly licensing those visitors to make a copy of that page.

11  *See* Edward A. Cavazos, *Intellectual Property on the WWW: Linking, License and Liability*,

12  576 PLI/Pat 559, 578-582 (1999). By default then, a user can access, copy, display and store a

13  page without additional permission. If a site owner wishes to restrict the access to or use of the

14  materials it makes available, it is incumbent upon the site owner to impose those restrictions by,

15  for example, utilizing passwords or other technical measures to restrict access. Put differently,

16  where copyright holders know that parties are using their works and remain silent or encourage

17  such use, they have impliedly licensed such use as a matter of law. *See Keane*, 968 F. Supp. at

18  947; *Quinn*, 23 F. Supp. 2d at 749-50.

19

20      [11]     In *Keane*, the original copyright owner (Lehman Brothers) had transferred certain
        of its assets to the defendant (Smith Barney). *See Keane*, 968 F. Supp. at 946. Smith Barney
21      subsequently used the copyrighted software at issue to interface with a system that it had
        purchased from Lehman Brothers. *See id.* Lehman Brothers knew that Smith Barney was using
22      the copyrighted software, and did not object. *See id.* Lehman Brothers also answered Smith
        Barney's technical questions on how to use the copyrighted software. *See id.* The Court found
23      that Lehman Brothers had granted Smith Barney an implied license because Lehman Brothers
        knew that Smith Barney was using the copyrighted software and had remained silent. *See id.*

24      [12]     In *Quinn*, the copyright owner (Mr. Quinn) worked in the City of Detroit's legal
25      department. *See Quinn*, 23 F. Supp. 2d at 743. While employed there, he developed a software
        program and installed it on his employer's computers. *See id.* He also allowed other employees
26      in the legal department to use his software. *See id.* He later sent the City a letter demanding that
        it stop using his software. *See id.* at 745 (¶15). Mr. Quinn's coworkers continued to use the
27      software after he sent the letter, with his knowledge and encouragement. *See id.* at 745 (¶23).
        The Court held that Mr. Quinn, through his conduct, had granted the City an implied license to
28      use the software. *See id.* at 749-50.

2733774_1.DOC

1    The same legal construct necessarily extends to the operation of Internet search engines.

2 No search engine operator could possibly contact the owner of each of the billions of pages on

3 the Internet to ask for an express license to visit and copy that page for inclusion in search

4 results.  Instead, the Internet community long ago recognized that such permissions would have

5 to be communicated to "robots" automatically, using industry standard protocols.  The vast

6 majority of site owners (obviously including Field) want their pages to be listed in search

7 results so they can be easily located by Internet users.  Accordingly, the long-standing industry

8 protocols assume, by default, that a search engine like Google's has permission to visit, copy

9 and store a page, unless the site owner specifies otherwise by, for example, using a "robots.txt"

10 file or meta-tag instruction for particular pages.  Given this well-known and beneficial use of

11 works by search engines, if copyright holders remain silent by not utilizing industry-standard

12 instructions to limit use of their content, they impliedly license such use as a matter of law.

13 *See, e.g., Keane*, 968 F. Supp. at 947; *Quinn*, 23 F. Supp. 2d at 749-50.  Not surprisingly, Field

14 concedes that he granted Google an implied license to access, copy and store the pages on his

15 site for use in Google's search engine.  *See* Field Depo. at 143:13–144:1.

16    The same implied permission that Field concedes he granted for the copying of his

17 pages in the first instance, likewise applies to Google's presentation of "Cached" links for those

18 pages.  Given the breadth of the Internet, Google (and other Internet search engines) could not

19 possibly contact all site owners and ask for express licenses to provide "Cached" links for the

20 pages on their sites.  *See* Brougher Decl. ¶18; Levine Report ¶¶25-26.  Instead, site owners are

21 again expected to communicate their preferences to Google automatically, using industry

22 standard protocols.  *See* Brougher Decl. ¶18; Levine Report ¶¶25-26.  As noted, site owners

23 typically want search engines to provide "Cached" links to their pages because of the benefits

24 that "Cached" links afford to them and to Internet users.  Indeed, Google has provided

25 "Cached" links for billions of Web pages over the past seven years without incident.

26 Accordingly, industry protocols assume, by default, that a search engine has permission to

27 provide access to a cached copy of a Web page unless a site owner specifies otherwise by, for

28 example, using the well-known "no-archive" meta-tag — which can be added to a page in a

Snell & Wilmer
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1   matter of seconds. Again, given this long-standing, well-known and beneficial use of works by

2   search engines, if copyright holders remain silent by not utilizing industry standard instructions

3   to limit use of their sites, they impliedly license such use. *See Keane*, 968 F. Supp. at 947;

4   *Quinn*, 23 F. Supp. 2d at 749-50. The analysis need go no further. Field granted Google an

5   implied license to allow access to the pages of his site via "Cached" links as a matter of law.[13]

6              **2.       Field Granted Google An Implied License To Allow Access To**
                          **"Cached" Links Through His Conduct.**

7

8              For Field's litigation scheme to work, he had to ensure that Google would allow users to

9   access and copy the pages of his site via "Cached" links. Accordingly, Field did not merely

10  remain silent in the hope that Google would present "Cached" links for the pages of his site.

11  Instead, Field took several affirmative steps to make sure that Google did so.

12             Field manually submitted his site to Google, instructing the Googlebot to find and list

13  the pages of his site in Google's search results.[14] That is, Field effectively delivered his site to

14  Google. He did so knowing that when Google listed the pages of his site in its search results, it

15  would automatically provide "Cached" links to them. Thus, with full knowledge of how

16  Google would use the copyrighted works he placed on those pages, Field actively brought about

17  that use. As the U.S. Court of Claims has explained, by conveying a copyrighted work to

18  another party with the understanding of how that party intends to use it, a copyright holder

19  conveys an implied license to that use as a matter of law. *See Herbert v. United States*, 36 Fed.

20  Cl. 299, 310-311 (1996) ("Delivery of a copy of the work is one type of conduct that

21  demonstrates the existence of an implied license . . . . In doing so, the court finds that [plaintiff]

22  necessarily transferred a nonexclusive license for his works."); *see also Effects Assoc.*, 908 F.2d

23

---

24      [13]    The implied license that site owners grant to Google endures only until such time
        as they communicate an alternative preference to Google. As noted, that preference can be
25      communicated to Google and/or other search engines in a host of ways. Upon receipt of any such
        communication, Google promptly removes "Cached" links to the pages of the site.

26      [14]    As noted, Field did not stop at affirmatively submitting his site to Google's search
27      engine. He also created a robots.txt file instructing robots that they were free to access his site,
        and he further purchased advertising that he believed would increase the likelihood that the pages
28      would appear in Google's search results.

2733774_1.DOC

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1 at 559 n.6 (fact that copyright owner delivered work to defendant supported finding of implied

2 license). Field's conduct here likewise constitutes the grant to Google of an implied license to

3 allow access to the pages of his site through "Cached" links. *See Herbert*, 36 Fed. Cl. at 310-

4 311; *Keane*, 968 F. Supp. at 947; *Quinn*, 23 F. Supp. 2d at 749-50.

5    Of course, Field's active encouragement of the use about which he now complains did

6 not stop with his submission of his site to Google. Well aware of the industry-standard

7 instructions that would have informed Google not to display "Cached" links to his pages, Field

8 deliberately chose not to include them on the pages of his site. Again, he did so, knowing that

9 Google would interpret the absence of such instructions as permission to allow access to the

10 pages via "Cached" links. Again, with full knowledge of how Google would use the

11 copyrighted works he placed on those pages, and with full knowledge that he could easily

12 prevent such use, Field instead made a conscious decision to permit it. For this reason as well,

13 his conduct can only be interpreted as the grant of a license to Google for its use. *See, e.g.,*

14 *Keane*, 968 F. Supp. at 947 (copyright owner's knowledge of defendant's use coupled with

15 owner's silence constituted an implied license).

16    Last, but certainly not least, it was Field who clicked on the "Cached" links for the

17 pages of his site containing his copyrighted works. In response to Field's own request, Google

18 enabled Field to access the copy of those pages stored in its system cache from which he could

19 make and retrieve a copy for himself. As a result, this is not merely a case of a copyright holder

20 knowing of a use of his works and remaining silent or even encouraging that use, either of

21 which would give rise to an implied license. Here, Field himself was the direct cause of and

22 exclusively responsible for what he characterizes as Google's copying and distribution of his

23 works. There could be no clearer case for a finding that any copying or distribution by Google

24 was impliedly licensed as a matter of law.[15]

---

[15]    Field's acts and omissions establish the defense of implied license for any resulting copying or distribution of his works by Google. The same conduct, however, also provides another reason why Field could not carry his burden of establishing infringement. *See Hayden*, 281 F.2d at 548 (copyright owner has burden of proving infringement). Under Section 106 of the Copyright Act, a copyright holder has the exclusive rights to authorize the copying and distribution of his works. *See* 17 U.S.C. § 106 (2005). An infringement claim lies only where

(continued...)

**D.     Field Is Estopped From Asserting His Copyright Claim Against Google.**

The same conduct by Field that establishes Google's implied license defense also bars Field's claim under the equitable doctrine of estoppel. A plaintiff is estopped from asserting a copyright claim "if he has aided the defendant in infringing or otherwise induced it to infringe or has committed covert acts such as holding out . . . by silence or inaction." *See Quinn*, 23 F. Supp. 2d at 753 (internal quotation marks omitted, citing 4 NIMMER § 13.07 (1990)).

To prevail on its estoppel defense, Google must prove the following four elements:

1.  Field knew of Google's allegedly infringing conduct;

2.  He intended that Google rely upon his conduct or acted so that Google had a right to believe it was so intended;

3.  Google was ignorant of the true facts; and

4.  Google detrimentally relied on Field's conduct.

*See Carson*, 344 F.3d at 453 (citing 4 NIMMER § 13.07 (2002)); *see also Salgado-Diaz v. Ashcroft*, 395 F.3d 1158, 1166 (9th Cir. 2005) (listing the four estoppel elements). All four elements are easily satisfied by Field's manufactured claim.

**1.     Field Knew That Google Displayed "Cached" Links To Pages In Its Search Results, And That Google Would Allow Users To Access Those Pages By Clicking On The Links.**

To establish the first estoppel element, Google must show that Field knew of Google's allegedly infringing conduct. *See Hadady*, 739 F. Supp. at 1399-1400. Here, Field contends that Google supposedly infringed his copyrights by allowing him to access and retrieve copies of pages from his own site through "Cached" links. But Field concedes he knew that Google would automatically allow this access to his works when he posted them on the Internet unless

---

(...continued from previous page)
another party violates those exclusive rights. *See* 17 U.S.C. § 501 (2005). Where, as here, the claimed copying and distribution of works came at the direct request and instruction of the copyright holder (indeed, where the copies were made by the copyright holder himself), there has been no violation of the copyright holder's rights. *See Marvel Enters., Inc. v. NCSoft Corp.*, CV 04-9253-RGK (PLAx), (March 9, 2005 C.D. Cal.) at 2 (striking portions of Plaintiffs' copyright infringement claim based on characters that Plaintiffs created themselves using Defendant's computer game) (attached as Ex. 13 to the O'Callaghan Decl.). For this reason as well, Field's claim fails as a matter of law.

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702) 784-5200

1   he instructed otherwise.  Moreover, Field knew that if someone clicked on the "Cached" links

2   for pages of his site, they would immediately obtain a copy of those pages from Google's

3   system cache.  *See* Section II.D, *supra*.  Field thus knew of Google's allegedly infringing

4   conduct long before any supposed infringement of his works took place.  This is more than

5   sufficient to establish the first estoppel element.

6              **2.      Field Expected And Intended Google To Rely On His Conduct.**

7              To establish the second estoppel element, Google must show that Field intended that

8   Google rely upon his conduct or that Google had a right to believe that Field so intended.  *See*

9   *Quinn*, 23 F. Supp. 2d at 753.  This element is satisfied when the plaintiff aids or induces a

10  defendant to infringe the plaintiff's copyrights.  *See id.* at 743, 753 (plaintiff estopped from

11  claiming infringement of copyrighted software when he installed the software on his

12  employer's computers and allowed other employees to use the software).  It is also satisfied

13  where a copyright holder remains silent while a defendant uses a copyrighted work.  *See*

14  *Carson*, 344 F.3d at 453 ("[I]t is accepted that estoppel may be accomplished by a plaintiff's

15  silence and inaction."); *Keane*, 968 F. Supp. at 947 (copyright owner estopped because

16  predecessor in interest had remained silent while defendant used the copyrighted software and

17  had assisted defendant with using the software); *Martin v. Cuny*, 887 F. Supp. 1390, 1393, 1395

18  (D. Col. 1995) (plaintiff estopped from asserting copyright infringement when he failed to

19  assert his rights in copyrighted photographs that he transmitted to defendant).

20             Here, Field fully expected and intended that Google would rely on his omission of

21  industry-standard instructions from the pages of his site in presenting "Cached" links for those

22  pages.  Field could easily have informed Google not to provide those "Cached" links through

23  this method or a host of others.  Instead, he chose to remain silent knowing that Google would

24  automatically interpret that silence as permission to display "Cached" links.  *See* Section II.D,

25  *supra*.  By itself, Field's silence, particularly given his knowledge of the consequences of that

26  silence, amply satisfies the second estoppel factor.[16]

27

28             [16]     While Google need not show that it was entitled to rely on Field's silence in
    order to satisfy the second estoppel factor, it plainly had that right.  Because its communication
                                                                              (continued...)

2733774_1.DOC

1

**3.     Google Did Not Know That Field Objected To Google's Use Of "Cached" Links In The Search Results For His Web Site.**

2

3      To establish the third estoppel element, Google must show only that it did not know the

4   true facts – here, that Field objected (or at least now claims to have objected) to Google's

5   allowing access to the pages of his site through "Cached" links. *See Hadady*, 739 F. Supp. at

6   1400. Here, Google undisputedly had no such knowledge. *See* Macgillivray Decl. ¶2. Field

7   made no effort to communicate those preferences to Google prior to filing suit and, in fact,

8   deliberately remained silent. *See id.; see also* Field Depo. at 83:12 – 84:3. Because Google did

9   not know of Field's (now) stated preferences, the third estoppel element is undisputedly met.

10      **4.     Google Detrimentally Relied On Field's Conduct.**

11      To establish the fourth estoppel element, Google must show that it detrimentally relied

12   on Field's silence. *See Hadady*, 739 F. Supp. at 1400. Like the others, this factor is easily

13   satisfied.

14      There can be no dispute that if Google had known of Field's stated preferences, it would

15   not have presented "Cached" links to Field's pages. *See* Macgillivray Decl. ¶2; *see also*

16   O'Callaghan Decl. Ex. 7. Google honors copyright holders' requests that it not display

17   "Cached" links to their pages however those preferences are communicated. *See, e.g.*, Section

18   II.C, *supra*. Indeed, as noted, Google immediately removed the "Cached" links upon learning

19   of Field's lawsuit, even before hearing from Field. *See* Macgillivray Decl. ¶2. Google plainly

20   relied on Field's deliberate silence in displaying "Cached" links to the pages containing his

21   copyrighted works.

22      Google's reliance was obviously to its detriment. Had Field simply communicated his

23   preferences to Google, the parties could have avoided the present lawsuit. Instead, he

24   intentionally remained silent in order to manufacture a copyright infringement lawsuit that

25   Google has incurred considerable expense to defend. This trumped-up litigation by itself

26   _____

27      (...continued from previous page)
   with site owners can only be automated, Google has no choice but to rely on site owners to

28   communicate their permissions using these standard protocols.

Snell & Wilmer
L.L.P.
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702) 784-5200

1   establishes detrimental reliance as a matter of law. *See Hadady*, 739 F. Supp. at 1400

2   (existence of copyright infringement lawsuit established defendant's detrimental reliance).

3   That, in turn, completes the showing required to bar Field's claim under the equitable doctrine

4   of estoppel.

5       **E.    Google's Operation Of Its System Cache Is A Fair Use.**

6           Field's copyright infringement claim against Google also fails because Google's

7   conduct is protected under the fair use doctrine.

8           Fair Use Generally

9           Pursuant to the Copyright Act, the "fair use" of a copyrighted work "is not an

10  infringement of copyright." 17 U.S.C. § 107 (2005). As the Ninth Circuit has explained, the

11  fair use doctrine "creates a limited privilege in those other than the owner of a copyright to use

12  the copyrighted material in a reasonable manner without the owner's consent." *See Fisher*, 794

13  F.2d at 435 (9th Cir. 1986).

14          Pursuant to Section 107, the fair use inquiry involves consideration of at least the

15  following four factors:

16              (1) the purpose and character of the use, including whether such use is of a commercial
                    nature or is for nonprofit educational purposes;

17
                (2) the nature of the copyrighted work;
18
                (3) the amount and substantiality of the portion used in relation to the copyrighted work as
19                  a whole; and

20              (4) the effect of the use upon the potential market for or value of the copyrighted work.

21  *See* 17 U.S.C. § 107 (2005). The Court must "balance these factors in light of the objectives of

22  copyright law, rather than view them as definitive or determinative tests." *See Kelly*, 336 F.3d at

23  818. While no one factor should be dispositive, courts have traditionally given the most weight to

24  the first and fourth factors. *Compare Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579

25  (1994) (focusing primarily on first factor and whether use is transformative) *and Leibovitz v.*

26  *Paramount Pictures Corp.*, 137 F.3d 109, 114-15 (2d Cir. 1998) (affirming summary judgment of

27  fair use for parody based primarily on first fair use factor) *with Harper & Row, Publishers v.*

28  *Nation Enters.*, 471 U.S. 539, 565 (1985) ("[The fourth] factor is undoubtedly the single most

1   important element of fair use.").

2       Fair Use Applied to Search Engines

3       Congress has called search engines like Google's "essential to the operation of the

4   Internet." As Congress recognized, "without [search engines], users would not be able to find the

5   information they need." *See* H.R. REP. NO. 105-551, pt. 2, at 58 (1988).  Because search engines

6   routinely copy information on the Internet in order to make it accessible to others, the fair use

7   doctrine plays an important role in their operation.  Indeed, the Ninth Circuit has already had

8   occasion to apply the fair use factors to the operation of Internet search engines.  Its seminal

9   opinion and reasoning in *Kelly v. Arriba* are highly relevant here.

10      The Arriba search engine at issue in *Kelly* crawled Internet sites looking for electronic

11  images.  When it found one, the search engine made and stored a copy of the image within its

12  archive.  If that image was then deemed relevant to a particular search by a user, the search engine

13  would display its search results including a copy of the entire image in a somewhat reduced size,

14  along with a prominent link to the image as it existed on the content owner's site.  *See Kelly*, 336

15  F.3d at 815-16.  Kelly, a photographer, claimed that the search engine infringed the copyrights on

16  his photographs by making and distributing copies of them in its search results.  The Ninth Circuit

17  disagreed, finding, as a matter of law, that the search engine made fair use of the images.

18      The Ninth Circuit's principal focus in *Kelly* was on the first factor of the fair use analysis

19  — the purpose of the search engine's use.  As *Kelly* makes clear, the critical aspect of this inquiry

20  is whether a particular use is "transformative," that is, whether the use "merely superseded the

21  object of the originals or instead added a further purpose and different character." *See* 336 F.3d at

22  818.  The Ninth Circuit noted that Kelly offered his photographs for purposes of "artistic

23  expression." It recognized that, by contrast, the "search engine functions as a tool to help index

24  and improve access to images on the internet and their related web sites." *See id.*  It thus

25  concluded that the allegedly infringing use was "transformative." Indeed, the Ninth Circuit went

26  on to explain that the search engine promoted the goals of the Copyright Act, "benefit[ting] the

27  public by enhancing information-gathering techniques on the internet." *See id.* at 820.

28      Noting that the search engine was a for-profit operation, the Ninth Circuit nevertheless

1  concluded that the underlying commercial nature of the use was not of particular significance in

2  its "purpose" analysis:

3         Arriba was neither using Kelly's images to directly promote its web site nor trying to
          profit by selling Kelly's images. Instead, Kelly's images were among thousands of
4         images in Arriba's search engine database. Because the use of Kelly's images was not
          highly exploitative, the commercial nature of the use weighs only slightly against a
5         finding of fair use.

6  See Kelly, 336 F.3d at 820. Assessing the clearly transformative use and its incidental commercial

7  nature, the Ninth Circuit concluded the first factor weighed in favor of a fair use finding "due to

8  the public benefit of the search engine and the minimal loss of integrity to Kelly's images." See

9  id. at 820.

10        On the second fair use factor — the nature of the copyrighted work — the Ninth Circuit

11 recognized that the photographs at issue were artistic, but noted they had been made available on

12 the Internet, and noted that "[p]ublished works are more likely to qualify as fair use because the

13 first appearance of the artist's expression has already occurred." See Kelly, 336 F.3d at 820. The

14 Court thus found that this factor weighed only slightly against a fair use finding. See id.

15        On the third factor — the amount and substantiality of the work used — the Ninth Circuit

16 in Kelly readily acknowledged that the search engine had used the entirety of the plaintiff's

17 photographs, but found that did not weigh against a fair use finding, recognizing that to serve the

18 search engine's transformative purposes, it was necessary to use the complete work. See Kelly,

19 336 F.3d at 820-21.

20        The Ninth Circuit in Kelly found that the last fair use factor — the impact on the market

21 for the work — weighed in favor of a fair use finding. See Kelly, 336 F.3d at 821-22. It

22 concluded that the search engine's transformative use of Kelly's photographs did not harm any

23 supposed market for licensing of the works. See id. In fact, the Ninth Circuit recognized that the

24 search engine's use likely aided the market for the works by enhancing access to them. See id. at

25 821.

26        Weighing the factors together, the Ninth Circuit concluded that the search engine's

27 copying and/or distribution of the plaintiff's photographs was a fair use of those works, and thus

28 rejected the plaintiff's copyright infringement claim as a matter of law. See Kelly, 336 F.3d at

822. The same result should obtain with respect to Google's supposed infringement of Field's copyrighted works. Indeed, the factors here present an even stronger case for a finding of fair use than they did in *Kelly*.

### 1. Factor One: Google's Transformative Use Supports A Finding Of Fair Use.

#### a. The Google System Cache Serves A Different Purpose From That Of Plaintiff's Original Works.

According to the United States Supreme Court, the fair use analysis largely turns on one question:

> whether the new [use] merely 'supersede[s] the objects' of the original creation,...or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative'...Although such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works.

*See Campbell*, 510 U.S. at 579 (citations omitted); *Leibovitz*, 137 F.3d at 112-13. Courts consider whether a defendant's use is "transformative" in assessing the first of the four statutorily-identified fair use factors — "the purpose and character of the use." *See* 17 U.S.C. § 107 (2005); *see also Campbell*, 510 U.S. at 578-79; *Leibovitz*, 137 F.3d at 112-13. In this case, Google's alleged use of plaintiff's copyrighted works was highly transformative.

It would be charitable to label Field's copyrighted streams of consciousness as "art." Indeed, they plainly were jotted down for purposes of litigation, not for purposes of entertainment or enlightenment. Nevertheless, even if one were to assume that Field intended his work to enrich others, Google serves entirely different objectives by allowing users to access its archival copy of the works through "Cached" links. Much like the search engine in *Kelly*, Google offers "Cached" links "as a tool to help index and improve access to [information] on the internet . . . ." *See Kelly*, 336 F.3d at 818.

As described above, one of the principal purposes of Google's cache functionality is to enable users to access content when the original page is inaccessible, which can occur for a host of reasons. The Internet is replete with references from academics, researchers, journalists, and site owners praising Google's cache for precisely this reason. In these circumstances, Google's

Snell & Wilmer
L.L.P.
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1   archival copy of a work obviously does not substitute for the original. Instead, Google's

2   "Cached" links allow users to locate and access information that is otherwise inaccessible. *See*

3   *Kelly*, 336 F.3d at 820 (finding search engine's use of copyrighted material transformative in part

4   because it "benefit[ted] the public by enhancing information-gathering techniques on the

5   internet").

6          Providing users the ability to detect changes that have been made to a particular Web page

7   over time is another beneficial, transformative purpose served by Google's cache functionality.

8   *See, e.g.*, Levine Report ¶20. Such comparisons can reveal significant differences that have

9   political, educational, legal or other ramifications. Again, by definition, this information location

10  function cannot be served by the original Web page alone. And again, the pages in Google's

11  cache do not supersede the objective of the original. Indeed, to conduct such a comparison, a user

12  would need to access both Google's archival copy of a Web page and the current form of the Web

13  page on the Internet. *See id.* ¶22.

14         Google's third objective in offering "Cached" links — allowing users to readily understand

15  why a page was responsive to their query — also cannot be served by the original page. As noted,

16  it is often difficult for users to locate their query terms within a given page, and may be impossible

17  where the language of a page has been modified. Because it controls its archival copy, Google

18  can automatically highlight the user's query in the copy that the user then retrieves. *See, e.g.*,

19  Levine Report ¶17; Brougher Decl. ¶¶12, 16. Thus, by affording access to a page within its cache,

20  Google enables users to more quickly determine whether and where the relevant language appears,

21  and thus whether the page is truly germane to their inquiry. The objective of enabling users to

22  more quickly find and access the specific query for which they searched is not served by the

23  original page. *See Kelly*, 336 F.3d at 820.

24         Google also utilizes several design features to make clear that it does not intend a

25  "Cached" link of a page to substitute for a visit to the original page. In its search results, at the top

26  of each listing, Google prominently features a link to the original Web page. *See* Section II.A

27  above. By contrast, when "Cached" links are displayed, they are in a smaller font, and in a less

28  conspicuous location. *See id.* Further, after a user clicks on a "Cached" link, he sees a prominent

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

2733774_1.DOC

disclaimer at the top of the page explaining that he is only viewing a snapshot of the page from Google's cache. *See* Sections II.A & II.B, *supra*; *see also* Brougher Decl. ¶12 ("Google's cache is the snapshot that we took of the page as we crawled the web. The page may have changed since that time."). The disclaimer also includes not one, but two, separate links away from the archival copy and to the original, current page. *See* Section II.B, *supra*. Accordingly, any user seeking to access the original page has more than ample opportunity to do so. If they choose instead to access Google's archival copy, they do so intentionally. Plainly, Google is not seeking to supersede the objectives of original Web pages by offering "Cached" links to those pages.

In addition to designing its cache functionality in this manner, Google also ensures that any site owner can disable the cache functionality for any of the pages on its site in a matter of seconds. *See*, *e.g.*, Brougher Decl. ¶21. Thus, site owners, and not Google, control whether "Cached" links will appear for their pages. The fact that the owners of billions of Web pages choose to permit these links to remain is further evidence that they do not view Google's cache as a substitute for their own pages.

Ultimately, there is no evidence whatsoever that those who utilize "Cached" links are doing so as a substitute for visiting original pages.[17] *See*, *e.g.*, Levine Report ¶¶21-23. There is, by contrast, undisputed evidence that Google serves different and socially important purposes in offering access to pages through "Cached" links. *See id.* ¶¶16-20. As a result, there should be no question but that Google's supposed copying and distribution of those pages are significantly transformative.

### b. Google's Status As A Commercial Enterprise Does Not Negate Fair Use.

For a time, courts applying the fair use doctrine would look less favorably upon any use of a work by a commercial entity. But as the Supreme Court made clear in its most recent discussion of the doctrine, that approach was in error. Where a work is transformative, the "commercial" nature of the use is of less importance in the analysis. *See Campbell*, 510 U.S. at

---

[17] There is certainly no evidence that users accessed the pages containing Field's works via Google's "Cached" links in lieu of visiting those pages directly.

Snell & Wilmer
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1    579 ("[Transformative] works thus lie at the heart of the fair use doctrine's guarantee of

2    breathing space within the confines of copyright, and the more transformative the new work, the

3    less will be the significance of other factors, like commercialism, that may weigh against a

4    finding of fair use."). As the Supreme Court explained, many of the fair use examples described

5    by Congress in the Copyright Act itself (*e.g.*, news reporting) are conducted for profit in this

6    country. *See id.* at 584. It thus cannot be the case that any use of a copyrighted work by a

7    commercial enterprise is unfair. Indeed, that is precisely what the Ninth Circuit recognized in

8    *Kelly* when it concluded the search engine's commercial objectives did not weigh heavily against

9    a fair use finding. *See* 336 F.3 at 818 ("Arriba was neither using Kelly's images to directly

10   promote its web site nor trying to profit by selling Kelly's images. Instead, Kelly's images were

11   among thousands of images in Arriba's search engine database.").

12        Google's use of Field's works, like the use in *Kelly,* was at most, only incidentally

13   commercial. While Google is a for-profit corporation, there is no evidence Google sought to

14   profit in any way by the use of any of Field's works. Rather, Field's works were among *billions*

15   of works in Google's database. *See, e.g.*, Levine Report ¶13; Brougher Decl. ¶3 (noting that

16   there are billions of Web pages in the Google index). Moreover, when a user accesses a page via

17   Google's "Cached" links, Google displays no advertising to the user, and does not otherwise

18   offer a commercial transaction to the user.[18] *See* Brougher Decl. ¶13; *see also* O'Callaghan Decl.

19   Ex. 8 (screen capture produced by Field without bates-numbers showing that there was no

20   Google advertising in Google's cache copy of Field's Web pages). Put simply, Google makes no

21   money from displaying "Cached" links to Web pages, and certainly made no money by

22   displaying "Cached" links to Field's pages. Accordingly, as in *Kelly*, the fact that Google is a

23   commercial operation is of only minor relevance in the fair use analysis. The transformative

24   purpose of Google's use is considerably more important, and, as in *Kelly*, means the first factor

25   of the analysis weighs in favor of a fair use finding.

26

27

---

28   [18]    By contrast, the Arriba search engine at issue in the *Kelly* case did, for a time,
     provide advertising in connection with its display of others' images. *See Kelly*, 336 F.3d at 816.

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702) 784-5200

2.   **Factor Two: The Nature Of Field's Minimally Creative Works —**
     **Which Field Made Available For Free To The World And Submitted**
     **To Google's Search Engine — Supports A Finding Of Fair Use.**

The second fair use factor looks to the nature of the plaintiff's work. In the context of transformative uses such as Google's, this factor has been described as "not . . . terribly significant in the overall fair use balancing" (*see Mattel*, 353 F.3d at 803) and "not much help" (*see Campbell*, 510 U.S. at 586).

In *Kelly*, the Ninth Circuit analyzed this factor by considering whether the works were "creative" or more "fact-based," and whether they were published. *See Kelly*, 336 F.3d at 820. While the Ninth Circuit recognized that the plaintiff's photographs were "creative," it noted that the photographs had not only been published, but had been made available to the world for free on the plaintiff's own Web site. *See id.*; *see also Diamond v. Am-Law Publ'g Corp.*, 745 F.2d 142 (2d Cir. 1974) (finding fair use for a letter to the editor that was published in a modified form); *Salinger v. Random House, Inc.*, 811 F.2d 90, 95 (2d Cir. 1987) (describing *Diamond* as "applying fair use to a letter to the editor of a newspaper, which, though not previously printed, was obviously intended for dissemination"). The Ninth Circuit thus found in *Kelly* that this factor weighed only slightly in favor of the plaintiff. *See* 336 F.3 at 820.

If anything, this factor weighs even more heavily in Google's favor than it did in favor of the search engine in *Kelly*. Unlike the artistic photographs at issue in *Kelly*, the works in question here were simply Field's ramblings. The fifty-one "works" were created in just three days, as part of Field's scheme to enrich himself by suing Google. *See* O'Callaghan Decl. Ex. 2 at 2 (Plaintiff's Response to Interrogatory No. 5); *see also* Field Depo. at 141:15-24. Accordingly, these are certainly not works that are deserving of any enhanced protection.

As in *Kelly*, Field also published his works on the Internet, thereby making them available to the world for free at his Web site. *See* First Amended Complaint ¶¶8, 10; *see also* Field Depo. at 94:10-19. Moreover, Field took a host of additional steps to ensure that his works would have as wide an audience as possible, including submission of his Web site for inclusion in Google's search engine and creation of a "robots.txt" file to ensure that search engines would fully index his Web site. *See, supra*, Section II.D. Given that Field sought to make his works available for free

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1    to the widest possible audience, and given that he manufactured those works for purposes of

2    litigation, the "nature" of the works at issue here weighs in favor of a fair use finding.

3           **3.      Factor Three:  Google Used No More Of The Text Of Field's Web
                      Pages Than Was Necessary For Google's Transformative Use.**

4

5           The third fair use factor looks at the amount of the work used.  The Supreme Court long

6    ago made clear that even copying of entire works should not weigh against a fair use finding

7    where the new use serves a different function from the original, and the original work can be

8    viewed by anyone free of charge:

9           [W]hen one considers the nature of a televised copyrighted audiovisual work, and that
            *time-shifting merely enables a viewer to see such a work which he had been invited to*
10          *witness in its entirety free of charge*, the fact that the entire work is reproduced docs not
            have its ordinary effect of militating against a finding of fair use.

11

12   *See Sony*, 464 U.S. at 449-50 (emphasis added; citations omitted) (affirming as a fair use the

13   "time-shifting" of entire television shows).  Similarly, the Ninth Circuit has held that "the extent

14   of permissible copying varies with the purpose and character of the use" and that "[i]f the

15   secondary user only copies as much as is necessary for his or her intended use, then this factor

16   will not weigh against him or her."  *See Kelly*, 336 F.3d at 820-821.

17          Not surprisingly then, the Ninth Circuit in *Kelly* concluded that the search engine's use of

18   entire photographs was of no significance:

19          This factor neither weighs for nor against either party because, although Arriba did copy
            each of Kelly's images as a whole, it was reasonable to do so in light of Arriba's use of
20          the images.  It was necessary for Arriba to copy the entire image to allow users to
            recognize the image and decide whether to pursue more information about the image or
21          the originating web site.  If Arriba only copies part of the image, it would be more
            difficult to identify it, thereby reducing the usefulness of the visual search engine.

22

23   *See* 336 F.3d at 821; *see also Mattel*, 353 F.3d at 803 n.8 (holding that "entire verbatim

24   reproductions are justifiable where the purpose of the work differs from the original").

25          Just like the broadcasters in *Sony*, and the photographer in *Kelly*, Field made his content

26   available to anyone, free of charge.  Also like the fair uses in *Sony* and *Kelly*, Google's use of

27   entire Web pages in its Cached links is essential for the valuable, transformative purposes of the

28   Cached links.  As discussed more fully in Section III.E.1.a above, the Google cached links serve

1    multiple transformative and socially valuable purposes.  For obvious reasons, none of these

2    purposes could be accomplished by using only portions of the Web pages.  Without including the

3    whole Web page, the Google Cached link cannot assist Web users (and content owners) by

4    offering access to pages that are otherwise unavailable.  Nor could use of less than the whole page

5    assist in the archival or comparative purposes of Google's Cached links.  Finally, Google's

6    offering of highlighted search terms in Cached copies of Web pages would not allow users to

7    understand why a Web page was deemed germane if less than the whole Web page were provided.

8    *See generally* Brougher Decl. ¶¶14-16; *see also* Levine Report ¶¶15-20.

9            The *Sony* and *Kelly* cases are squarely on point.  Both make clear that the third fair use

10   factor is neutral despite the fact that Google allowed access through "Cached" links to the entirety

11   of Field's works.  *See Sony*, 464 U.S. at 448; *Kelly*, 336 F.2d at 821.

### 4.    Factor Four:  Google's "Cached" Links Had No Negative Effect On The Market For, Or Value Of, Field's Works.

14           The final statutorily-recognized fair use factor considers the effect of the defendant's use

15   upon the potential market for the plaintiff's work.  Again, "a use that has no demonstrable effect

16   upon the potential market for, or the value of, the copyrighted work need not be prohibited in

17   order to protect the author's incentive to create."  *See Sony*, 464 U.S. at 450.   Put differently,

18   where a copyright holder cannot show that the challenged use of his work carries "*some*

19   *meaningful likelihood of future harm*" to the market for his work, the fourth factor weighs in favor

20   of a fair use determination.  *See id.* at 451.  Here, Field cannot possibly make the showing

21   required to tilt the balance on this factor in his favor.

### a.    Google's "Cached" Links Had No Impact On Field's Works At All.

23           Field has acknowledged that he was the only person to have clicked on the "Cached" links

24   for the pages containing his works.  *See, e.g.*, Field Depo. at 121:20-25.  Accordingly, the

25   availability of those "Cached" links did not cause anyone to eschew a direct visit to the pages of

26   Field's site.  Since Google long ago removed the links to those pages, their presence could not

27   have caused any harm to, and will not have any impact upon, the market for or value of Field's

28   works.

Snell & Wilmer
L.L.P.
LAW OFFICES
1800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1    **IV.    CONCLUSION**

2              For the foregoing reasons, Google respectfully requests that the Court grant the present

3    motion for summary judgment and hold that:  (1) Field has not established that Google

4    infringed his copyrights; (2) to the extent Google could be characterized as having made or

5    distributed copies of Field's works, Field impliedly licensed such use by Google; (3) by virtue

6    of his acts and omissions, Field is estopped from claiming that Google infringed his copyrights;

7    and (4) Google's allegedly infringing activities are a fair use.

8

9    Dated:  September 2⟨6 2005                    SNELL & WILMER L.L.P.

10

11                                          By: ___DH Vnw_____

12                                               Kelly A. Evans
                                                 Nevada Bar No. 7691
13                                               3800 Howard Hughes Parkway, Suite 1000
                                                 Las Vegas, NV  89109
14
                                                 and
15
                                                 David H. Kramer
16                                               William O'Callaghan
                                                 WILSON SONSINI GOODRICH & ROSATI
17                                               650 Page Mill Road
                                                 Palo Alto, CA  94304-1050
18
                                                 Attorneys for GOOGLE INC.
19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702)784-5200

1

## CERTIFICATE OF MAILING

2     I certify that a true and correct copy of the foregoing MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF GOOGLE INC.'S MOTION FOR SUMMARY
3     JUDGMENT was served on the **2 7** day of September, 2005, by placing same in the United
States mail, postage prepaid, addressed to the following:

4

5     Blake A. Field
      9805 Double Rock Drive
      Las Vegas, NV  89134
6     Telephone (702) 373-1022
      Pro Se Plaintiff

7

8

9                                        _Judith S. Warren_

10                                 An employee of Snell & Wilmer, L.L.P.

11    84973.1

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3800 HOWARD HUGHES PARKWAY, SUITE 1000
LAS VEGAS, NEVADA 89109
(702) 784-5200